UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-mj-1022 (DTS)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

RIVER WILLIAM SMITH,

        Defendant.

**ORDER OF DETENTION**

This matter came before the Court on December 20, 2022, for a preliminary hearing and a hearing on the motion of Plaintiff United States of America ("the Government") for an Order of Detention as to Defendant River William Smith ("Defendant"). (Dkt. 7.) Defendant was present and represented by his attorney, Jordan Kushner. (*Id.*) The Government was represented by Assistant United States Attorney Manda M. Sertich. (*Id.*) The Court found probable cause and Defendant was bound over for further proceedings by a United States Grand Jury. (*Id.*) Based on the evidence presented at the hearing, the Bond Report, the arguments of counsel, and all the files and proceedings herein, the Court found that the Government has met its burden of showing by clear and convincing evidence that there are no conditions or combination of conditions which can reasonably assure the safety of any other person and the community if Defendant is released. Accordingly, the Government's motion for detention is granted.

## FINDINGS OF FACT

On December 14, 2022, Defendant was charged by Complaint with violations of Title 18, United States Code, Section 922(o) (Possession or Transfer of a Machinegun),

and Title 26, United States Code, Section 5861(d) (Attempted Receipt or Possession of Destructive Devices Not Registered in the National Firearms Registration and Transfer Record). The Complaint alleges that on or about December 14, 2022, Defendant knowingly possessed a machine gun and attempted to possess three explosive grenades that were not registered to him in the National Firearms Registration and Transfer Record ("NFRTR").

In seeking detention of Defendant, the Government relied on both the Bond Report, which recommended detention, and the testimony of Special Agent Mark Etheridge of the Federal Bureau of Investigation ("FBI"). In recommending detention, the Bond Report noted Defendant's substance abuse history, mental health history, lack of employment, prior arrest, and the circumstances underlying his prior arrest, and the nature of the instant offense.

Special Agent Etheridge provided extensive testimony at the December 20 hearing on several topics. First, Special Agent Etheridge summarized an incident in 2019 where Defendant, who was 17 years old at the time, discharged an AK-47 in the residence he shared with his grandmother and grandfather in Savage, Minnesota.[1] His grandmother was struck in the hand with debris or fragmentation, causing her injury. During the execution of search warrants following that incident, law enforcement discovered the AK-47, several handguns, a rifle, a shotgun, magazines, tactical equipment, and ammunition. During the search of Defendant's electronic devices, law enforcement

---

[1] Special Agent Etheridge testified that Defendant still resides in the same home with his grandparents in Savage.

discovered searches relating to Hitler and Nazis, files relating to bomb building and manufacturing bombs, and videos of homosexuals being killed.

Special Agent Etheridge testified that Defendant came to law enforcement's attention in 2022 when two concerned citizens contacted the FBI to report that Defendant, who is 20 years old, was engaging in concerning behavior at a shooting range. In particular, Defendant was repeatedly visiting a shooting range in body armor and shooting large volumes of ammunition around barriers and while lying on the ground. Both concerned citizens found this conduct unusual for the shooting range. One of the witnesses estimated that, on one occasion, Defendant shot 300 rounds in 20 minutes.

According to Special Agent Etheridge, the FBI then began conducting surveillance of Defendant. On one occasion, agents observed Defendant's grandmother drive Defendant to the shooting range, where Defendant engaged in the same conduct as described by the concerned citizens. On that day, in addition to the body armor and tactical gear, Defendant was wearing a "Punisher" mask, which is a mask that looks like a skeleton and has been adopted by violent, extremist groups. *See* Gov't Ex. 1. Special Agent Etheridge testified that the same mask was worn by a mass shooter who killed 26 people in a Texas church in 2017.

Special Agent Etheridge testified that a reliable, FBI confidential human source ("CHS-1") communicated with Defendant online on a social media platform. During these conversations, Defendant expressed his disdain for Jewish persons (writing that he took a DNA test to ensure he did not have any Jewish blood) and for Black persons (writing that Black persons were sent by Satan to "test us"). Defendant also wrote to

CHS-1 that he liked shooting but could not shoot as much as he liked to because of his age. He sent CHS-1 an image (Gov't Ex. 2) of three handguns and an AR-style rifle he purported to own. In mid-November, Defendant communicated with CHS-1 via the social media platform and indicated that he had access to full auto lowers (a rifle lower receiver that operates fully automatic) and suppressors (muzzle devices that reduce the sound intensity when a gun is discharged).

Special Agent Etheridge testified about a second FBI confidential human source ("CHS-2") who engaged with Defendant at the shooting range. All of the meetings between CHS-2 and Defendant were audio recorded. At the time of their first meeting, CHS-2 was shooting a weapon with a binary trigger (which shoots one bullet on the pull of a trigger and one bullet on the release of a trigger) next to Defendant at the shooting range, and Defendant struck up a conversation with CHS-2. During that initial conversation, Defendant brought up the topic of fully automatic weapons. When CHS-2 asked Defendant about his style of shooting at the range, Defendant responded that he was preparing to fight the police and was dedicated to dying in a fight with the police. During this initial meeting, CHS-2 observed that Defendant was wearing body armor and a Kevlar helmet and possessed two handguns and a high-end AR-style rifle with a high-end scope. Under Minnesota law, it is unlawful for an individual under the age of 21 to possess a handgun unless shooting under the supervision of an adult at a range. CHS-2 observed that Defendant was not supervised that day.

Special Agent Etheridge testified that CHS-2 and Defendant met at the shooting range again a couple of days later. Defendant told CHS-2 that he wanted an auto sear for

4

his high-end AR-style rifle.  According to Special Agent Etheridge, Defendant initiated the conversation about wanting auto sears.  During that conversation, Defendant said that if "they" came for him, he wanted to have the auto sears.  CHS-2 told Defendant that an auto sear would cost $120, and Defendant provided CHS-2 with a $60 down payment for auto sears.  Later that same day, Defendant texted CHS-2 and requested an auto sear for his Glock handgun using coded language.  Special Agent Etheridge testified that based on agents' observations of Defendant, Defendant always carried his Glock on his person, which was more concealable than other weapons owned by Defendant.

On that same date, Defendant sent messages to CHS-1 indicating that he was previously interested in joining The Base, a Neo-Nazi paramilitary group.  He wrote that he had buddies in the group who did things like pipe bombs, but that he did not join because The Base got caught by law enforcement.

Several days later, Defendant exchanged messages with CHS-1 indicating that he was kicked off a video game platform called "Call of Duty: Warzone" because while he played the video game, which involves engaging in combat with individuals from a "first person shooter" perspective, he was calling other players a racial slur that starts with the letter "n".  CHS-1 asked Defendant about his views on the recent mass shooting at an LGBTQ nightclub in Colorado Springs, Colorado, and Defendant called the shooter a "hero."  Defendant indicated he would only engage in a mass shooting if it was with law enforcement and wrote that he sympathized with the Parkland school shooter who killed 17 people.  Defendant then wrote at length about dying in a shootout with law enforcement.  On December 5, 2022, Defendant sent CHS-1 messages indicating that he

stayed up late at night watching body cam videos of police shootings in order to study his "enemy."

Special Agent Etheridge testified that Defendant met up with CHS-2 again several days later. Defendant raised the issue of destructive devices with CHS-2 and indicated that he was interested in M67 hand grenades. Defendant asked CHS-2 whether CHS-2 could obtain hand grenades and indicated that he wanted three of them for his tactical vest. At that time, Defendant and CHS-2 agreed to focus on getting the auto sears. During the same meeting, Defendant indicated that he carries a letter in his body armor telling the police to "fuck" themselves. Defendant indicated law enforcement would find the note after Defendant was killed in a shootout and while they were clearing the bodies of law enforcement officers he killed.

Special Agent Etheridge testified that Defendant met up with CHS-2 again in early December. CHS-2 referenced Defendant's previous statements regarding hand grenades, and Defendant asked whether Defendant could get them. The following day, CHS-2 texted Defendant about the hand grenades Defendant requested using coded language. Defendant asked CHS-2 how much the hand grenades cost. Using coded language, Defendant also inquired about obtaining items that CHS-2 interpreted to mean additional auto sears and suppressors. Special Agent Etheridge testified that Defendant met up with CHS-2 again several days later. CHS-2 informed Defendant that he would be able to get hand grenades and provided Defendant with a price. Defendant indicated he wanted the hand grenades and provided CHS-2 with a down payment.

Special Agent Etheridge also testified that during the fall of 2022, Defendant's grandmother purchased more than a thousand rounds of ammunition for Defendant from one store. Video surveillance showed Defendant picking out the ammunition and giving it to his grandmother for purchase. Law enforcement also conducted a "trash pull" at Defendant's residence and found empty boxes for hollow point pistol cartridges. Special Agent Etheridge testified that this is not a type of ammunition that is normally used at shooting ranges because it is more expensive and is made to inflict more harm on human bodies; it is the type of ammunition used by law enforcement.

Special Agent Etheridge also testified that Defendant wrote to CHS-1 during their communications that he sold guns to friends of his that are felons and indicated that he was trying to purchase auto sears and suppressors from someone other than CHS-2.

Special Agent Etheridge testified that the FBI provided CHS-2 with three auto sears and three inert hand grenades to conduct a controlled delivery of those items to Defendant. On December 14, 2022, CHS-2 met with Defendant and provided him with the auto sears and hand grenades. CHS-2 showed Defendant the devices and talked about them. Defendant took the auto sears and hand grenades and paid CHS-2 $690 in cash for them.

After CHS-2 cleared the scene, law enforcement arrested Defendant without incident. At the time of his arrest, Defendant, who was wearing soft body armor, had the auto sears and hand grenades in his possession, along with his Glock handgun (loaded with a bullet in the chamber) and three magazines (containing about 50 rounds of ammunition). In Defendant's vehicle that he drove to the controlled delivery, Defendant

had multiple firearms including his AR-style rifle, thousands of rounds of ammunition in magazines, body armor, ballistic helmets with goggles and plates, edged weapons for fighting in close quarters, targets, and a battle belt.  Special Agent Etheridge noted that Defendant always made a reservation to go to the shooting range but did not have a reservation for that day.

Law enforcement executed a search warrant at Defendant's residence that same day.  During the protective sweep of the residence, agents asked Defendant's grandparents whether there were any weapons in the residence, and Defendant's grandmother responded that there were not.  Defendant's grandfather corrected her and noted that there were weapons in the residence.  Law enforcement discovered other firearms in the residence, along with a "Black Sun" flag (a Neo-Nazi flag) in the vicinity of Defendant's bedroom.

Defendant signed a waiver form and agreed to speak with law enforcement.  He told agents that he purchases ammunition on his own but had not done so in a year, except for one legal purchase of ammunition about three to four weeks prior in Wisconsin.  He also indicated that he did not know much about automatic weapons and that he did not know what auto sears were.

That same evening, Defendant called his grandmother on a recorded jail line. Defendant said to his grandmother, "Maybe I should've…I didn't even have an option to do anything bad."  *See* Gov't Ex. 4 (partial transcript).  When Defendant's grandmother said it was good he did not do anything, Defendant responded, "Yeah, they had 15 guys draw down on me."  (*Id.*)

The defense argued at the hearing that Defendant should be released because: (1) the Government only presented portions of the conversations between Defendant and CHS-1 and CHS-2 and between Defendant and his grandmother; (2) Defendant engaged in negative speech about certain groups of individuals, but did not have any specific plans to harm anyone; and (3) Defendant may have been supervised by his grandmother while at the shooting range.

## DISCUSSION

Under 18 U.S.C. §§ 3142(e) and (f), detention may be ordered either upon clear and convincing evidence showing that release will result in a danger to the community or upon a showing by a preponderance of the evidence that release will result in a serious risk of flight or non-appearance. *United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003); *United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986).

The Court considered the evidence and arguments presented by the Government and the defense in relation to the factors this Court must consider pursuant to 18 U.S.C. § 3142(g). The nature and circumstances of the offense charged include the possession of auto sears and an attempt to possess destructive devices, which are serious offenses. As to the weight of the evidence against Defendant, the evidence includes recorded meetings and text messages. While the Court had only portions of the conversations between Defendant and CHS-1 and CHS-2 before it, the defense did not make any argument as to what was missing that would be relevant to the question of detention, and the Court notes that Special Agent Etheridge testified that Defendant was the first person

to mention full auto weapons, auto sears, and destructive devices in his conversations with CHS-2.

The history and characteristics of Defendant include his age, his strong family ties to his grandparents, and his lack of employment. Defendant's history and characteristics also include both audio-recorded and online written conversations with the two CHSs relating to obtaining auto sears and grenades. They also include the 2019 incident where he discharged an AK-47 inside of his grandparents' house, resulting in a minor injury to his grandmother's hand. There is evidence in the Bond Report that Defendant has mental health and substance abuse issues, including a report in 2020 indicating Defendant used cocaine, Xanax, oxycodone, and marijuana, and that Defendant is not currently receiving treatment for those issues.

The Court turns to the nature and seriousness of the danger to any person and the community posed by Defendant's release. Relevant to this factor, the Court found that evidence of the following supports the need for detention: (1) Defendant's possession of auto sears and attempted possession of explosive hand grenades; (2) Defendant's possession of an AR-style rifle, handguns, tactical gear, and ammunition at the time of his arrest; (3) Defendant's unlawful possession and carrying of handguns while underage; (4) Defendant's demonstrated racist ideology as to Black persons, Jewish persons, and his dislike of homosexuals; (5) Defendant's stated desire to join The Base; (6) Defendant's stated support for mass shootings; (7) Defendant's statement that one mass shooter was a "hero"; (8) and Defendant's extensive ideation of and planning for a violent exchange with law enforcement. The Court also found that Defendant, who repeatedly expressed

dislike of law enforcement before his arrest, may be more inclined to attack law enforcement officers now that he has been charged and the matter has been escalated.

The Court considered the defense's arguments that Defendant had no "specific" plans to harm anyone and that he was arrested without incident, which the defense argues shows that Defendant does not pose a danger to the community or law enforcement. The Court did not find those arguments persuasive. There is extensive evidence that Defendant has repeatedly expressed the intent and desire to engage in a shoot-out with law enforcement. The fact that there is no evidence of a "specific" plan does not meaningfully alleviate the danger Defendant poses to law enforcement, as well as to any other member of the community, including members of the groups disliked by Defendant. Further, at the time of Defendant's arrest, he was wearing soft body armor; had the auto sears, the hand grenades, his Glock handgun (loaded with a bullet in the chamber), and three magazines (containing about 50 rounds of ammunition) in his possession; and the following was found in the vehicle Defendant drove to the controlled delivery: multiple firearms including Defendant's AR-style rifle, thousands of rounds of ammunition in magazines, body armor, ballistic helmets with goggles and plates, edged weapons for fighting in close quarters, targets, and a battle belt. Special Agent Etheridge also testified that Defendant indicated to CHS-2 that, in general, he wanted auto sears to better fight law enforcement. In view of these facts, the Court declined to conclude that Defendant is not a danger to the public (including law enforcement) because there is no evidence of a "specific" plan.
11

Moreover, Defendant seemed to express regret that he did not engage in a shoot-out with law enforcement when arrested on the instant charges. *See* Gov't Ex. 4 ("Maybe I should've…I didn't even have an option to do anything bad"). While the defense argued that this quote was taken out of context and is part of a partial transcript, Defendant's grandmother's response that "it's good that you didn't" and "are safe" and Defendant's subsequent comment that there were "15 guys" drawn on him—suggesting he was either explaining why he did nothing or speculating that doing "anything bad" would have resulted in his death—supports the conclusion that Defendant was expressing regret for not resisting his arrest. The defense could have offered evidence of what else was said during this call (including the grandmother's testimony) to support its argument that the partial transcript is misleading, but did not. The Court therefore concluded that there is a risk of danger to the community, including law enforcement, if Defendant were released given his statement indicating his regret for not engaging with the police when arrested, as well as based on the evidence discussed above.

Finally, the Court considered the defense's argument that Defendant may have been supervised by his grandmother at the shooting range. There was testimony that at least on certain occasions, Defendant was not supervised by his grandmother at the shooting range, and Defendant presented no evidence that he was ever supervised by his grandmother at the shooting range. The Court found this argument unpersuasive.

The Court carefully considered whether there are conditions or a combination of conditions that could reasonably assure the safety of the community. The Court first considered Defendant's release to reside with his grandparents and be monitored by his

grandmother. Given the evidence, including Special Agent Etheridge's testimony, that Defendant's grandmother purchased large amounts of ammunition for Defendant and appears to have been aware that Defendant was attempting to purchase auto sears and hand grenades, *see* Gov't Ex. 4, the Court is not persuaded that Defendant's grandmother provides reasonable assurances that Defendant will not pose a danger to any other person and the community if released. Moreover, Special Agent Etheridge's testimony that Defendant's grandmother told law enforcement that there were no other weapons in the house, when in fact there were other firearms in the house, was unrebutted. Regardless of whether Defendant's grandmother made an intentionally false statement or was simply mistaken, this further confirms that Defendant's grandmother does not provide reasonable assurances as to the safety of any other person or the community if Defendant were released to his grandparents' residence. While Defendant's grandfather did correct the grandmother's statement, there is no evidence that the grandfather would provide sufficient reasonable assurances as to the safety of the community with respect to monitoring Defendant—particularly as Defendant was living with his grandparents at the time the alleged conduct took place. In sum, there is no evidence that release to Defendant's grandparents' home and monitoring by his grandparents would reasonably assure the safety of any other person and the community.

The Court also considered releasing Defendant to a halfway house. However, given the nature and seriousness of the danger presented by Defendant, including the threat of a shooting or mass shooting, the Court found that a halfway house does not provide sufficient structure to reasonably assure the safety of the community. Similarly,

the Court found GPS monitoring with release to Defendant's grandparents' house or a halfway house insufficient to reasonably assure the safety of the community, as GPS monitoring would do little to reduce the risk posed to the community, namely that of a shooting or mass shooting. *See United States v. Bracey*, No. 15CR2352JNETNL, 2020 WL 1809187, at *4 (D. Minn. Apr. 9, 2020) (explaining that location monitoring proposed by Defendant "does little to reduce the danger posed by his release"). For all of these reasons, the Court found that the Government met its burden of showing by clear and convincing evidence that there are no conditions or combination of conditions which can reasonably assure the safety of any other person or the community if Defendant were released.

## CONCLUSION

The Court concludes that no condition or combination of conditions of bond will reasonably ensure the safety of the community. Accordingly, **IT IS ORDERED** that:

1. The motion of the United States of America for detention of Defendant is **GRANTED**;

2. Defendant is committed to the custody of the United States Marshals for confinement in a correctional facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

3. Defendant shall be afforded reasonable opportunity to consult privately with his lawyer; and

4. Upon Order of the Court or request by the United States of America's Attorney, the person in charge of the corrections facility in which Defendant is confined

shall deliver him to the United States Marshal for the purpose of appearance in connection with a court proceeding.

Dated: December 30, 2022        *s/ Elizabeth Cowan Wright*
                                THE HONORABLE ELIZABETH COWAN WRIGHT
                                United States Magistrate Judge