UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-cr-07 (DSD)

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | **GOVERNMENT'S POSITION ON SENTENCING** |
| RIVER WILLIAM SMITH, | |
| Defendant. | |

## INTRODUCTION

COMES NOW the United States of America, by and through its undersigned attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Andrew R. Winter, Assistant United States Attorney, and submits the following position on sentencing.

## Summary of the Government's Argument

The defendant maintains a fascination with fully automatic weapons and explosives, he harbors anti-government, racist, antisemitic, and homophobic ideologies, and he has researched, applauded, and justified mass shootings. In 2022, the defendant took extraordinary measures to train and equip himself for a violent confrontation with police by obtaining machinegun conversion devices and what he believed were three hand grenades.

This defendant presents a unique danger to the public. His offense conduct, combined with an examination of the sentencing factors found in 18 U.S.C. § 3553(a), compels the conclusion that an upward departure to the statutory maximum sentence of 120 months followed by three years of supervised release is necessary to protect the public from further crimes of the defendant and to deter the defendant, and others, from similar conduct.

## FACTS[1]

### Fall of 2022 - Tips from the Public

In September of 2022, a concerned citizen contacted the FBI to report troubling behavior by the defendant. The citizen, a retired police officer working at a local gun range frequented by the defendant, had observed him set up a plywood barricade, then don a Level IV plate carrier.[2] The defendant proceeded to lay on the ground and shoot under and around the barricade, all while conducting rapid reload drills with his semiautomatic pistol. The witness estimated that the defendant had fired 300 rounds of ammunition in 20 minutes. But this was not an isolated incident. The defendant's behaviors would attract the attention of another concerned citizen. This person noted

---

[1] The United States agrees with and incorporates by reference the facts from the "Offense Conduct" section of the Presentence Report ("PSR"), ¶¶ 6-33.

[2] A Level IV plate carrier is the highest armor rating and is tested to protect against several direct pistol and rifle shots.

2

that the defendant wore black tactical clothing and a chest plate carrier when he was practicing shooting. This witness watched the defendant fire approximately 300 rounds of ammunition at no targets, all while lying on the ground. In response to this information, the FBI initiated surveillance that would capture the following image of the defendant conducting shooting drills while wearing a distinctive "Punisher" skull mask[3]:



As the FBI's investigation continued, two separate confidential human sources (CHSs) began communicating with the defendant. On November 15, 2022, an

---

[3] This Punisher mask has been adopted by groups advocating for increased violence from right-wing fringes and was worn by mass shooter Devin Kelley during a church shooting in Texas in 2017 that killed 27 people.

exchange with a CHS revealed the defendant's knowledge of and interest in fully automatic weapons and suppressors.[4] The relevant portion of that exchange is depicted in this screen capture:



The defendant told the CHS "I'm a bit of an extremist when it comes to guns…You have to practice with what you intend to use in a life or death

---

[4] Suppressors, also known as silencers, are muzzle devices that reduce the sound intensity and muzzle rise when a gun is discharged.

situation." PSR, ¶ 10. On November 16, 2022, a different CHS would meet the defendant in person at a gun range. The CHS's use of a binary trigger[5] sparked conversation between the two men. PSR, ¶ 12. When the CHS asked about the defendant's aggressive shooting style, the defendant told the CHS that he is preparing himself to fight the police – and that he was dedicated to dying in that fight. He would emphasize that he does not want his guns taken away again; an apparent reference to a 2019 seizure of his guns by the Savage Police Department.[6]

### Defendant Seeks Machinegun Conversion Devices

On November 17, 2022, the defendant and the CHS met again at a gun range. The defendant told the CHS that he wanted an "auto sear" – a device

---

[5] A binary trigger is a legal replacement trigger that allows the shooter to fire one round with the pull of the trigger and an additional round with release of the trigger; this enables shooters to double their round count.

[6] In December of 2019, the defendant (then age 17) fired multiple rounds from an AK-47-style assault rifle inside his grandparent's home causing an injury to his grandmother's hand. The defendant told police that he had taken a variety of drugs which caused him to hallucinate. PSR, ¶54. In a search of the home, officers from the local police department seized two pistols, multiple loaded 7.62 mm magazines, a 12-guage shotgun, a loaded 22 caliber rifle, tactical gear, a drum magazine, ammunition, and gun parts from the defendant's home. PSR, ¶ 54. In a post-*Miranda* interview, the defendant acknowledged his interest in firearms, and he admitted that he had obtained bomb-making documents online. The defendant was petitioned as a juvenile and would later admit the felony offense of "Discharge of a Firearm Endangering the Safety of Another" in violation of Minn. Stat. § 609.66, Subd. 1a (2). He was adjudicated delinquent and placed on probation until his 19th birthday, during which time he was prohibited from possessing any firearms.

that would convert his AR-style assault rifle into a machinegun. When the CHS told him the device would cost approximately $120, the defendant promptly supplied a down payment. Later that day, the defendant reached out to this CHS, asking if he could get a conversion device for a Glock handgun as well.

**Defendant Seeks Hand Grenades**

On November 28, 2022, the defendant sought to add hand grenades to his arsenal. In a recorded conversation with a CHS, the defendant brought up the topic of "frag grenades", asking the CHS "is that somethin' you could possibly get, or no?" He would tell the CHS he wanted the grenades to outfit his tactical vest. In a recorded conversation with the CHS several days later, the defendant referenced the fact that, in the future, he may be interested in obtaining a "remote detonating bomb".

On December 5, 2022, the defendant agreed to pay $250 for each hand grenade, and in doing so, asked whether the three grenades he was purchasing would be "live". When the CHS confirmed they would be live grenades, the defendant replied, "Oh, fuck yeah" and gave the CHS a $200 down payment.

**Defendant's December 14th Arrest**

On December 14, 2022, the defendant drove his white Jeep to a convenience store parking lot intending to take possession of the auto sears and grenades from the CHS. At this moment in time, the defendant's car held approximately over 900 rounds of ammunition loaded into eleven (11) different

magazines – including a loaded drum magazine for his assault rifle (pictured below). The defendant was wearing a soft armor ballistic vest and carried a loaded semi-automatic pistol with a round chambered and multiple loaded pistol magazines in his waistband.  In the back seat was an uncased AR-style assault rifle with a scope (pictured below), a tactical helmet with goggles, a holster, a battle belt, hard armor ballistic plates and a vest fully holding six (6) fully loaded rifle magazines. When the defendant took the auto sears and the hand grenades[7] from the CHS, he was surrounded by FBI agents and taken into custody.



*vest with loaded rifle magazines found in the back seat*

---

[7] The hand grenades supplied to the defendant had been rendered inert for the safety of the officers, the CHS, and the defendant.



*assault rifle*



*Loaded drum magazine found on the floor of the defendant's Jeep*

**Evidence Found in the Defendant's Home**

The same day as his arrest, agents searched the defendant's home where

he lived with his grandparents. Agents recovered the following:

- ***From the defendant's basement living room***:  a loaded
  Glock 9mm handgun under a couch, a Remington rifle on the
  couch, a loaded 9mm magazine, several loose rounds of
  ammunition.

- *From the defendant's bedroom*: a Glock 9mm handgun on his bedroom dresser, a loaded rifle magazine, loose ammunition on his desk, and an ammunition can containing 9mm ammunition.
- *From the defendant's bedroom closet*: a .45 caliber handgun, a S&W 357 revolver, a Maverick Arms 12-gauge shotgun, a flak vest, and loose ammunition.

### Defendant's Post-Arrest Interview

The defendant waived his *Miranda* rights and agreed to an interview. Among the topics discussed, he told FBI agents that he is unemployed and spends most of his time researching guns and playing "first-person shooter" video games. He admitted owning numerous firearms and said that he had purchased 500 rounds of 5.56 assault rifle ammunition approximately one year earlier and, a month before his arrest, some 9mm ammunition in Wisconsin. He claimed that he limits his shooting at the range to a couple of magazines due to the cost of ammunition. He further claimed that no one else purchased ammunition for him.[8]

In the interview, the defendant expressed disdain for mass shooters; labeling them "losers", but said "these are guys who were in shitty situations, and they chose to take the selfish route." When asked why he wanted auto sears and hand grenades, he told agents he was having hard time thinking and

---

[8]Contrary to this claim, surveillance video at a local sporting goods store depicts the defendant with his grandmother purchasing 200 rounds of .223 rifle ammunition (a 5.56 equivalent) plus 250 rounds of 9mm handgun ammunition on December 9, 2022 – a mere five days before his arrest.

that he needed a cigarette. Later in the interview, he would claim these items were going to be "range toys".

**Procedural History and PSR**

On May 16, 2023, the defendant entered a straight plea[9] to Count 1 of the Indictment alleging Possession of a Machine Gun in violation of Title 18 U.S.C. §§ 922(o) and 924(a)(2). The Presentence Report ("PSR") has calculated a total offense level of 22 (PSR, ¶51) and a Criminal History Category of I (PSR, ¶ 57) which results in an advisory guidelines range of 41-51 months. PSR, ¶101.  The PSR has identified a number of factors that may warrant a sentence outside of the advisory guideline system including, but not limited to his significant interest and knowledge of firearms, his attitudes about racial, religious and ethnic groups, his threats of violence, and his post-plea statements. PSR, ¶¶ 120-127. The defendant has filed a number of factual and legal objections to the PSR. *See* ECF Doc. 72.  The government has filed no objections to the PSR. For the reasons discussed below, the government is seeking an upward departure to a sentence of 120 months, which represents the statutory maximum sentence for the offense of conviction.

---

[9] There is no plea agreement between the defendant and the government.

**Enhancement for Number of Firearms**

The defendant's objection to a 2-level enhancement for the number of firearms involved in the offense should be overruled. Grenades qualify as "destructive devices" under Title 26 U.S.C. § 5845(f), and destructive devices are included in the definition of "firearms" under Title 18 U.S.C. § 921(a)(3)(D) – the operative provision underlying the enhancement. *See* U.S.S.G. §2K2.1, comment. (n.1). According to U.S.S.G. § 2K2.1, comment. (n.5), "[f]or purposes of calculating the number of firearms under §2K2.1(b)(1), count only those firearms that were ***unlawfully sought to be obtained***, unlawfully possessed, or unlawfully distributed" (emphasis added).

Here, while the inert nature of the hand grenades arguably suggests they were not actual destructive devices under Title 26 U.S.C. § 5845(f), there is little question that the defendant, in taking possession of those items on December 14, 2022, *sought* to obtain three (3) live hand grenades. Thus, a plain reading of Application Note 5 suggests that the 2-level increase is appropriate. Support for this can be found in *United States v. Maturino*, 887 F.3d 716 (5th Cir. 2018) which held a sentencing court "may enhance based on the number of firearms a defendant sought to obtain, even if he actually obtained far fewer." It further noted its interpretation honors the plain meaning of Application Note 5 and "averts senseless threats to public safety, and just makes sense." *Id*. at 724. Finally, the Court observed "[defendant's] plan for

11

live grenades fell short, but close counts in horseshoes and hand grenade cases." *Id*. at 726. This same logic should apply to the case at bar.

### **Upward Departure Pursuant to Section 3A1.4, Note 4.**

***"I don't shoot cops for speeding tickets, but if they ever attempted to get my guns, I would open fire... And I can put all the training to use...I hated life without guns."***

***"If I get ticketed no big deal but if they try to search or arrest me, I'm killing them..."***

An upward departure under Section 3A1.4, cmt. n.4(A) ("Note 4"), is warranted for a defendant, whose offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct but the offense involved, or was intended to promote, an offense other than one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)." Here, the evidence shows that the defendant's crime of Possession of a Machinegun was calculated to retaliate against members of law enforcement for what he perceived was their enforcement of "unconstitutional gun laws". PSR, ¶10.

*a. Legal Standard*

An adjustment for terrorism applies where the offense "involved, or was intended to promote, a federal crime of terrorism," which is defined by statute in 18 U.S.C. § 2332b(g)(5). *See* U.S.S.G. § 3A1.4, cmt. n.1. If the defendant's offense was intended to promote a federal crime of terrorism, the Section

12

3A1.4(a) adjustment would apply. Here, the government is not seeking application of the Section 3A1.4(a) adjustment, but instead, an upward departure. While the defendant's offense of possession of a machinegun is not enumerated under 18 U.S.C. § 2332b(g)(5), the offense of conviction was nonetheless "calculated to…retaliate against government conduct." U.S.S.G. § 3A1.4, cmt. n.4(A).

A defendant's offense is "calculated," as required by § 3A1.4, if the offense was specifically intended to have the effect of influencing, affecting, or retaliating against government[10] by force or the threat of force. *See, e.g., United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012)(defendant's narcoterrorism offense had requisite "calculation" where evidence showed defendant "specifically intend[ed] to use the commission from the drug sales to purchase a car to facilitate attacks against U.S. and foreign forces in Afghanistan"). While they are related, "calculation" for the § 3A1.4 enhancement is distinct from a defendant's particular "motive" and a

---

[10] "Government" is defined as "the body of persons that constitutes the governing authority of a political unit or organization. Webster's Third New International Dictionary 982 (3d ed.1976); *see also* Black's Law Dictionary 695 (6th ed. 1990). Unless the Sentencing Guidelines provide a special definition of the particular term whose meaning is at issue, Courts give the language of the Guidelines its ordinary meaning. *See e.g. United States v. Archambault,* 344 F.3d 732, 736-37 (8th Cir. 2003)(term "government entity" in U.S.S.G. § 5K2.7 included Native American Tribal District vans destroyed by the defendant).

defendant need not be "personally motivated by a desire to influence or affect the conduct of government," so long as defendant's crime was "calculated to have such an effect." *Khatallah*, 314 F. Supp. 3d at 199. [11]

### b. Evidence of Intent to Retaliate Against Government

Here, the defendant repeatedly expressed a desire to commit acts of violence against law enforcement in retaliation for police seizing his firearms in 2019 – a grievance that has festered over the three years leading up to his December 14, 2022 purchase of auto sears and hand grenades. The defendant's statements to the CHSs, text messages with friends, and jail calls with family members provide ample evidence to conclude that his efforts to obtain auto

---

[11] Application of Note 4 to the defendant's conduct is consistent with the application of Note 4 by other courts around the country. In *United States v. Doggart*, the sentencing court imposed a Note 4(A) upward departure where the defendant was convicted of soliciting the destruction of religious property in connection with his plan to burn down buildings in a Muslim community, seeking to "set[] in motion an armed insurrection against the government of the United States that would force the government of the United States either to respond to" the defendant's planned attacks, "or to give in and capitulate." No. 15-cr-39-CLC-SKL (E.D. Tenn. Sep. 16, 2020), ECF 343 at 6. The Sixth Circuit recently affirmed, agreeing that the defendant's offense was "calculated to influence or affect government conduct by intimidation or coercion." *United States v. Doggart*, No. 20-6128, 2021 WL 5111912, at *2-4 (6th Cir. Nov. 3, 2021). There, the sentencing court upwardly departed from an otherwise applicable guidelines range that called for 51 to 63 months of imprisonment (equivalent to offense level 24 at Criminal History Category I) to a range of 324 to 405 months of imprisonment (equivalent to offense level 41 at Criminal History Category I).[3] *Id.* After departing upward, the court sentenced the defendant to the statutory maximum for his sole offense of conviction, ten years of imprisonment. *Id.* at *1.

sears and hand grenades were steps in a plan to engage in a retaliatory shootout with law enforcement. His own words provide the nexus between the 2019 seizure of his firearms and his intense hostility towards police motivating his offense conduct.

For example, in a November 15, 2022, text exchange, the defendant was asked what he would want if he was granted five wishes. The defendant's top-two wishes were: "1) induce a brain aneurysm in every member of law enforcement, and 2) remove all gun laws." PSR, ¶9.  The very next day, he told the CHS that he was preparing himself to fight the police – emphasizing that he did not want his guns "taken away again". In another recorded conversation, he told the CHS he did not want to fight enemies abroad "when the police in this country attack everyone who likes guns via enforcing unconstitutional gun laws…".  The defendant would add, "I've had issues with them in the past…like if I get ticketed no big deal but if they try to search or arrest me I'm killing them to be honest. I wear body armor and multiple guns so I can defeat cops if I'm pestered. PSR, ¶10.

In the November 16, 2022 conversation, the defendant specifically referenced his 2019 arrest and the confiscation of his firearms. He predicted, "in my lifetime they're going to try to go after every semi-auto…and the sad thing is, most people, like gun owners, will lay down you know...but fuck, I've got nothing to lose, fucking let's go." The defendant also stated, "the only people

15

I'd ever kill have guns and body armor as well…If [law enforcement] come for me I'm ready to die and meet God…I'd die before every being handcuffed again…I don't shoot cops on sight for speeding tickets, but if they ever attempted to get my guns, I would open fire, yes…. And I can put all the training to use…I hated life without guns." PSR, ¶14.

On November 23, 2022, the defendant communicated with one CHS about his suspicions regarding the other CHS. Referring to the upcoming meeting to take possession of the auto sears and hand grenades, the defendant predicted, "if I got there and he's an informant, let's just say I'd waste him and as many cops as I could then I'd be dead." He would go on, "every day when I leave the house I grab my cross necklace and mentally prepare myself to die or take out cops." PSR, ¶15. During a December 5, 2022, conversation with a CHS, the defendant texted that he had been studying his "enemy" by watching police bodycam shootings on YouTube. PSR, ¶ 18. Further, in text messages found on his phone after his arrest, the defendant described a "good dream" in which he throws a hand grenade into a room full of police officers, then closes the door. He then described entering the room and walking "from cop to cop shooting them with the G18[12]". PSR, ¶ 26.

---

[12] A "G18" is a fully automatic pistol manufactured by Glock.

In his first jail call after his arrest, the defendant expressed disappointment that he had not engaged agents in a firefight. Recalling the precise moment when the FBI announced their presence (after he took possession of the auto sears and inert hand grenades), he told a family member "[m]aybe I should've...I didn't even have an option to do anything bad...they had 15 guys both draw on me." PSR, ¶ 29. In another recorded jail call months later, the defendant reflected on his federal arrest: "I gave up control the moment I put my hands up...I don't know why I can't remember things in the moment, man, just like when they arrested me, I should have remembered special ed, I should have remembered 2019, and I should have said 'Nope'".

Beyond the defendant's own words, the circumstances at the time of his arrest evidence his impending action. Not only did the defendant secure auto sears and what he believed were hand grenades, but he did so after purchasing 450 rounds of ammunition just 5 days earlier. Not only had his supplied himself with this quantity of ammunition, but the defendant had loaded that ammunition into eleven separate magazines – including the drum magazine pictured above. And with this arsenal, the defendant had his AR-style assault rifle, Level IV body armor, a helmet with goggles, a battle belt, knife, and a fully loaded 9mm semiautomatic pistol with two spare fully loaded magazines.

All of this evidence – viewed as a whole – provides this Court with ample evidence to conclude that the defendant obtained the auto sears to make

17

himself as deadly as possible in a shootout with police. As such, an upward departure under U.S.S.G. § 3A1.4, cmt. n.4(A) is warranted.

### Adjustment for Acceptance of Responsibility

*"I feel the opposite of guilty..."* July 8, 2023
*"I need at least guns to get out of here."* June 2, 2023

U.S. Probation has recommended denying the downward adjustment under U.S.S.G. § 3E1.1(a). PSR, ¶¶ 36-41. The government concurs. The U.S.S.G. provides for a two-level reduction if the defendant 'clearly demonstrates acceptance of responsibility for [his] offense. *See* U.S.S.G. § 3E1.1(a). "A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.' *United States v. William, 681 F.3d 936, 939 (8th Cir. 2012).* Indeed, it is the defendant's burden to prove his entitlement to the reduction. *Id. (citing U.S.S.G. § 3E1.1 cmt. n.2).* While a guilty plea is evidence in favor of this adjustment, "the key issue is whether the defendant has shown 'a recognition and affirmative responsibility for the offense and sincere remorse." *United States v. Nguyen*, 52 F.3d 192, 194 (8th Cir. 1995) (quoting *United States v. Knight*, 905 F.2d 189, 192 (8th Cir. 1990)). The reduction's purpose is to "distinguish[ ] a sincerely remorseful defendant from a defendant not manifesting penitence." *Knight*, 905 F.2d at 192.

To make this determination, courts look to a non-exhaustive list of factors to consider, including whether the defendant has "withdrawn from

criminal conduct". *United States v. Arellano*, 291 F.3d 1032, 1034-35 (8th Cir. 2002). Here, the defendant has not only failed to show genuine remorse, but he has denied having committed a crime, he has told others that he has no intention of complying with supervision when his prison term expires, and he has failed to withdraw from criminal conduct.

Once again, the defendant's own words make this point. Prior to his guilty plea, told a family member that he would "lie and plead guilty, even though I'm not guilty." PSR, Addendum, p. 4. During a July 8, 2023 jail call, he told his mother that he feels "the opposite of guilty because obviously these [fully automatic] weapons need to be in the hands of the public if they scare these tyrants so much." One month later, the defendant told a family member, "[t]here is no way I will accept the fact that I did something wrong…". With regard to sentencing hearing itself, the defendant stated, "I'm never going to agree, I'm never gonna learn anything…just give me my sentence and piss off." Further, on August 11, 2023, the defendant told a family member that his federal arrest and prosecution "will essentially be a badge of honor."

The defendant has also failed to withdraw from criminal conduct. After his guilty plea, the defendant sought money to obtain firearms and abscond from jail and, later, from supervision. His scheme was evidenced in a series of recorded jail calls with family members:

- On May 24, 2023, the defendant asked his grandmother for $100,000. When she asked why he needed this money, he replied, "I'm doing something in here". Minutes later, when his mother asked what the money was for, he instructed her not to ask questions.
- One week later, when his mother told him she would get him the $100,000, he revealed that he needed the money because "even if they let me out, I'm still f***n' over a thousand miles from where I need to be." He explained further, "imagine you can't get on a plane and you're being hunted."
- Later that same day, the defendant told his grandmother he needs the money "to get out of here", adding "the average infantry soldier carries $37,000 in equipment on his body." When his mother joined the call, he told her "I need at least guns to get out of here."[13]

The 8th Circuit recently addressed a defendant's continued criminal conduct as a basis for denying the downward adjustment under § 3E1.1(a). In *United States v. Cooper*, 998 F.3d 808 (8th Cir. 2021), the defendant aided a jail assault prior to entering his guilty plea to federal charges. The 8th Circuit emphasized that "[t]he [sentencing] court was entitled to rely on [the jail assault] in denying acceptance of responsibility. *Id.* at 811.

Ultimately, granting a 3-level decrease to one who shows no genuine remorse, who is plotting further criminal activity, and who refuses to acknowledge that he has committed a crime serves to create unwarranted

---

[13] Additional statements relating to the defendant's lack of remorse and failure to accept responsibility are documented at ¶¶ 30-33 of the PSR.

sentencing disparities with those defendants who do, in fact, genuinely accept the responsibility for their crimes.

**Inadequacy of Criminal History**

At a Criminal History Category of I, the advisory guideline range is 41-51 months. PSR, ¶101. However, U.S. Probation has identified U.S.S.G. § 4A1.3(a)(1) as potential basis for an upward departure in this case. PSR, ¶ 118. The government has separately moved for an upward departure under this provision. *See* ECF Doc. 86.

When, as here, "the defendant's criminal history category substantially underrepresents the likelihood that the defendant will commit other crimes, an upward departure may be appropriate." U.S.S.G. § 4A1.3(a)(1). In deciding the likelihood that a defendant may commit other crimes, a court may "take into account any 'evidence of obvious incorrigibility'" and "conclude that ... leniency has not been effective." *United States v. Herr,* 202 F.3d 1014, 1016 (8th Cir.2000) (quoting *United States v. Goings,* 200 F.3d 539, 542 (8th Cir.2000)).

Reliable information available to this Court shows the high likelihood that this defendant will commit other crimes. The leniency shown to the defendant by the juvenile courts was not effective and evidence of his "obvious incorrigibility" abounds. The defendant's infatuation with violence, his dangerous ideologies, his obsession with firearms, and his stated intentions to

21

be non-compliant upon release from prison all support the conclusion that he is likely to reoffend in a violent manner – and with the use of a firearm.

The extent of a § 4A1.3(a)(1) departure is guided by using, as a reference, "the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most closely resembles that of the defendant's." U.S.S.G. § 4A1.3(a)(4)(A). While the defendant's prior juvenile offense is instructive, it is not the entire story. Rather, it is his "repetitive expressions that he intends to recidivate" (PSR, A.6) combined with his determination to possess firearms and his violent rhetoric that supports this § 4A1.3(a)(1) motion.

### 5K2.0 Upward Departure

U.S. Probation has also identified §5K2.0 as a potential basis for an upward departure. *See* PSR, A. 4. Pursuant to U.S.S.G. §5K2.0(a)(1)(A), the Court may depart from the applicable guideline range if the Court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating circumstance of a kind or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described. This departure provision is particularly relevant in the event the Court does not apply a two-level enhancement under §2K2.1 for the presence of the (inert) hand grenades. §5K2.0 allows the Court

to account for this aggravating circumstance that would not otherwise impact the guideline range.

## Discussion of the 3553(a) Factors

The Court must determine what constitutes a reasonable sentence as guided by the factors of Title 18, United States Code, Section 3553(a).  As a first step, the Court must determine the applicable Sentencing Guidelines. Although the Guidelines are advisory, the Court must "remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). In addition to considering the Guidelines, Section 3553(a) requires the Court to analyze a number of factors, including the nature and circumstances of the offense, the history and circumstances of the defendant, the need for the sentence to reflect the seriousness of the offense, the need for deterrence, the need to protect the public from further crimes of the defendant, and the need to avoid unwarranted disparities. 18 U.S.C. § 3553(a). An examination of these factors leads to the conclusion that the requested sentence of 120 months is sufficient, but not greater than necessary to effectuate the goals of federal sentencing.

### Nature and Circumstances of the Offense

The facts set forth above and in the PSR establish that the defendant's crime is extremely serious and carried with it a very real risk that the machineguns would be deployed against not only members of law enforcement,

but the public at large.[14]

<u>The History and Characteristics of the Defendant</u>

**"I'm pro mass shooting in general…"**
**"I'm going to shoot up this mall."**

An examination of the history and characteristics of the defendant support the requested sentence of 120 months. The defendant – having previously been involved in the unlawful use of an assault rifle – maintained his fascination with mass shootings, fully automatic weapons, explosives, and violence in general. When layering this against his racist, antisemitic, homophobic and anti-government ideologies, the picture that emerges signals the need for the requested sentence of 120 months.

1. *Defendant's Interest in Mass Shootings*

The evidence in this case reveals the defendant's troubling fascination with mass shootings. For example, the defendant's internet search history gleaned from his home computer displays his intense and persistent interest in mass shootings. PSR, ¶ 28. Some of the specifics include a saved tabs on his browser for "*4th of July parade mass shooting live updates: 6 killed, suspect at*

---

[14] The government has requested an evidentiary hearing at the time of sentencing. *See* ECF Doc. 77. The government anticipates calling a witness to testify about the set of behaviors known as the "Pathway to Violence". The scope of this witness' testimony will be limited to educating the Court on the Pathway to Violence which is relevant to the Court's analysis of the 3553(a) factors. The government will be filing an expert notice consistent with Rule 16(a)(1)(G)(iii).

*large*". The search also revealed that during the month of November 2022, the defendant's YouTube viewing history included "*Orlando Nightclub Massacre: A Timeline of What Happened*" and "*Deadliest mass shooting in US history*". Further, the defendant conducted 26 searches related to the Colorado Springs mass shooting at a gay bar on November 19, 2022.[15] On November 20, 2022, the defendant searched for YouTube videos related to the Pulse Nightclub mass shooting in Orlando, Florida. His YouTube viewing history also included "*Measures to Combat mass Murders in Schools*" and the Parkland school shooter.  Further, a search of the defendant's two cell phones uncovered photographs of the weapons used in the 2019 Christchurch mass shooting in New Zealand.[16]

On one of the external drives connected to the defendant's desktop computer, agents discovered a screen recording[17] of the defendant watching and commenting on a YouTube video titled "*Minnesota: 24 Hours at the Largest Mall in America – What to Do, See, Eat at the Mall of America*". While watching

---

[15] On November 22, 2022, the CHS asked the defendant about the recent Colorado Springs shooting. The defendant replied by text, "Lmao (laughed my ass off) based (*sic*). I think the guys a hero."

[16] The 2019 Christchurch mass shootings were committed by a man armed with two AR-15 rifles and a 12-gauge shotgun.  Fifty-one Muslim worshippers were murdered by the white supremacist.

[17] This screen recording was stored as a video file on one of the defendant's external drives. The viewer of this video file sees the activity depicted on the desktop of the defendant's computer while the defendant can be heard narrating what he watches on his desktop.

this video of the Mall of America ("MOA"), the defendant recorded himself
stating:

- "there's a shooting range too. The whole mall. You can shoot
  people [*laughter*] you can shoot people"
- "Imagine walking into this place with body armor on and just
  shooting people"
- "This would be the BEST place to shoot up"
- "I'm going to shoot up this mall. I'm literally gonna [*laughter*],
  I'm gonna call in and be like 'I'm gonna go shoot up the Mall'
  and then I'm gonna go shoot up the Mall [*laughter*]"[18]

It is worth noting that U.S. Probation asked the defendant about the above
statements and the internet search using the phrase "mall of America metal
detectors". Unconvincingly, the defendant responded that his commentary was
intended as "shock humor". He added that the reason he researched metal
detectors at the MOA was to learn about the areas to avoid if he was carrying
a gun. PSR, ¶ 37.

The defendant also spoke of mass shootings with one of the CHSs.
During a November 22, 2022, text exchange, the defendant stated, "I'm pro
mass shooting in general." He then went on to blame the shooting victims of

---

[18] During a December 24, 2022, recorded jail call, the defendant told a family
member that he wished a recent MOA shooting had been "a big one." One day
before this jail call, a shooting had taken place at the MOA in Bloomington,
Minnesota resulting in the death of a 19-year-old man. This event received
widespread media coverage. S*ee e.g.* 5 suspects arrested in deadly Mall of
America shooting - ABC News (go.com); 3 Charged in Mall of America Killing
Days Before Christmas (usnews.com).

mass shootings for getting killed because they had the ability to wear body armor and carry a gun "and they didn't." The defendant wrote, "I would never do one. Well, maybe. Like if I was compromised by the police everyone I don't know it (*sic*) getting a few rounds just for fun."  He would later text, "the only people I'd ever kill have guns and body armor as well."

### 2.  *Evidence of Racially Motivated Extremism*

In a November 20, 2022, text message, the defendant told a CHS that he was kicked off the videogame Warzone[19] by moderators because he was calling people "nig- while killing them. Saying I was the kkk. Etc." In another text message, he stated "Black people ar (*sic*) agents of satan sent here to test us. That's what I believe." Additional text messages recovered from his cell phone after his arrest reveal his deeply held racial animus:

- On December 4, 2022, the defendant sent screenshot of a graph of murder rates titled, "America doesn't have a gun problem. It has a black problem." He followed this with the message, "kick a n*****r over and give him a G18 spray"[20]
- The defendant texted an image of an African American toddler tied up with tape over his mouth, writing: "I did something [*laughing emoji*]"
- The defendant texted, "I forgot to tell you, I joined the KKK." He then texted several KKK photographs.

---

[19] "Call of Duty: Warzone" is a combat videogame that allows players to live play online together; while playing the game, players are in a first-person shooter perspective while they engage in battles and skirmishes.
[20] A G18 is a fully automatic pistol manufactured by Glock.

- In a November 26, 2022, WhatsApp message exchange, the defendant complained about the ATF's terminology, "while n****rs run around spraying random innocent kids with stray round from a switch…"
- On November 13, 2020, the defendant posted on Discord: "You can take the monkey outta the jungle but you can't take the monkey outta the n****r"
- The defendant told a CHS that he took a blood test to make sure he didn't have any Jewish blood.[21]

In a December 23, 2022, recorded jail call, the defendant told a family member "…all the white supremacist gangs are, you know, a fan of me, obviously, so I don't have to worry about the Bloods or the Crips trying to do anything to me…".[22] In his post-arrest interview, the defendant admitted an interest in an organization called "The Base"[23] because it is "anti-communist" and "anti-left"[24] and, in a previous conversation with a CHS, the defendant stated that the "Punisher" skull mask he wore was a symbol for The Base – and was a symbol of his own racially motivated beliefs.

---

[21] In search warrants executed after his arrest as a juvenile in 2019, law enforcement encountered similar content on his devices. For example, the defendant had obtained information online about explosives, firearms, the "Al Qaeda Terrorism Manual", and "Explosives and Propellants from Commonly Available Materials." Further, his search history included queries relating to "white pride", the "SS", the killing of homosexuals, ISIS, The Base, Jihadi John, the plastic explosive "Semtex", ACAB (All Cops Are Bad), body armor, Nazi tattoos, and how to modify an AR15 to be fully automatic. PSR, ¶¶ 23-24.

[22] The defendant told U.S. probation that his recorded racist statements were the result of being "baited" by the CHS. PSR, ¶ 38.

[23] The Base is a white nationalist racially motivated extremist group.

[24] The defendant told agents that an individual online had attempted to recruit him into The Base and that he had declined to join.

### 3. Miscellaneous Statements Relevant to 3553(a) Factors

On December 5, 2022, the defendant texted the CHS and told him that he had not slept in twenty-four hours because he had been studying his "enemy" by watching police bodycam shootings on YouTube. When the CHS asked why he was watching videos about police encounters, the defendant replied, "I'm pretty fucked up I like seeing people get shot." PSR, ¶ 18.

During post-arrest confinement, the defendant has made a significant number of phone calls – a portion of which have been reviewed by investigators. The defendant has made a number of recorded statements in these calls that are relevant to the Court's assessment of the 3553(a) factors. For example, on June 29, 2023, the defendant told his mother:

- "I'll never not going to be wearing heavy armor again in my life";
- "I'm gonna have to do what people consider evil, but I guess it's how you look at things"; and
- he has no choice but to turn his weapons against the U.S. and that he will "arm anyone that sees those with a badge as the enemy."

On July 15, 2023, the defendant told his mother, "I just can't wait till I get outta here and then the only time I ever have to see the American flag again is if it's on blown up vehicles." In reference to the price charged for the hand grenades, the defendant stated, "I can make a better pipe bomb than any grenade you can get."

29

On August 1, 2023, the defendant spoke to his grandmother about his eventual federal probation. Referring to his probation officers, he stated he knows "they will pursue" him, and that he "will not get found" nor will the probation officer know what kind of vehicle he will drive. He continued, "I'm gonna ask [the sentencing judge] man to man, I'm gonna say, 'your honor, why don't you save everyone in here some trouble, why don't you just not give me probation? This is my intent, I want to leave, are you going to make that difficult?'" Regarding his federal arrest, the defendant said he wished he would've stayed in his car with his body armor on, then driven away, running over any FBI agents in the process. He insisted "everyone should have machineguns, and everyone should have explosives." Ultimately, while his youth, lack of an adult criminal history, academic struggles, and challenging family dynamics should be taken into consideration by this Court, those factors are significantly outweighed by the extraordinary danger he presents.

<u>The Need for the Sentence Imposed to Protect the Public</u>

In this unique case, the need to protect the public from the defendant is the paramount concern. His offense conduct, his violent and vitriolic ideologies, his fascination with fully automatic weapons, explosives, and mass shootings, combined with his post-arrest behavior all demonstrate the extraordinary danger he represents to law enforcement and to the public in general.

<u>The Need for Adequate Deterrence</u>

This case presents a significant need for both individualized and general deterrence. Individualized deterrence is that which discourages a defendant from ever committing such a crime again. Here, it is abundantly clear that the investigation and prosecution of the defendant has thus far done little to deter the defendant from committing new, serious crimes. The defendant's hostility towards law enforcement remains and it is clear that the defendant is already contemplating future violent crimes.

A significant sentence is also important as a general deterrent.  General deterrence is the public response necessary to deter others from committing similar crimes.  "Congress specifically made general deterrence an appropriate consideration . . . and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) (quoting *United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)).  A sentence of 120 months sends a strong message to other potential offenders that they risk significant federal penalties if they seek to unlawfully possess machineguns.

## <u>CONCLUSION</u>

When the defendant says that he does not believe in gun restrictions of any kind, that he is pro-mass shooting, and that he likes seeing people get shot, he should be believed. A 120-month sentence will best serve the goals of federal sentencing including – most importantly – protecting the public from further criminal conduct by the defendant.


Dated:        November 21, 2023          Respectfully submitted,

ANDREW M. LUGER
United States Attorney

*s/ Andrew R. Winter*

BY: ANREW R. WINTER
Assistant United States Attorney