UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal Case No. 23-CR-07 (DSD/JFD)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | **)** | |
| | ) | **DEFENDANT'S POSITION** |
| vs. | ) | **ON SENTENCING** |
| | ) | |
| RIVER WILLIAM SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

## I.      INTRODUCTION

Defendant River William Smith, through undersigned counsel, hereby submits his position with respect to sentencing. The defense strongly disputes numerous conclusions in the Presentence Investigation Report which twists the sentencing guidelines to multiply the normally applicable advisory range for Mr. Smith's offense. Specific areas of dispute include the recommendations of denial of acceptance of responsibility despite Mr. Smith clearly admitting to the offense and expressing his regrets, the addition of two points for three or more firearms and two more points for the offense involving a destructive device based on the dismissed charge relating to three inert grenades, an upward departure for understated criminal history based on one prior juvenile adjudication, and for an upward departure pursuant to USSG § 5K2.0(a)(1)(A) based on "concerning statements and

viewpoints he has held."[1]   The PSR further recommends overly restrictive conditions of supervision which infringe on Mr. Smith's First Amendment rights.

The PSR is driven by antagonism for Mr. Smith because controversial political views and anger that he has expressed in private communications. The interpretation of the sentencing guidelines and determination of Mr. Smith's sentence must be based on his actual conduct, both past and present, and not his personal views - most of which he has since disavowed.  The relevant factors for consideration are that there was nothing atypical about Mr. Smith's actual offense, he committed the offense in response to aggressive prompting  by FBI informants, his criminal history is so minimal that he is in Catetory I, he has no prior history of violence, there is no evidence of plans to actually carry out any acts of violence, and that his psychological conditions and social history provide explanations for his conduct and are treatable. Mr. Smith's social isolation, and depression and anxiety, along with the partial entrapment, further serve as mitigating

---

[1]  The PSR discusses but does not recommend an enhancement or upward departure under USSG §3A1.4 for crimes of terrorism. This position pleading will not discuss this provision because the PSR correctly notes that there was no crime of terrorism and therefore this provision clearly does not apply. Further, there is no conduct by Mr. Smith that could remotely fit the statutory definition of a "federal crime of terrorism." There is no suggestion that his actions had anything to do with influencing the conduct of government or retaliating against government conduct. He merely agreed to purchase firearm related items with no specific plans to use them much less influence or retaliate against a government.The government has stated an intent to move for an upward departure based on this provision. Mr. Smith will submit a reply position after reviewing the government's arguments which counsel has agreed to reserve for his reply so as not to benefit from the extension for the filing of this position.

factors which warrant a sentence below rather than above the applicable sentencing guidelines.

## II.     MR. SMITH'S BACKGROUND AND CIRCUMSTANCES OF OFFENSE.

River Smith was 20 years old at the time of the offense. At least 20 was his chronological age. Emotionally, socially and intellectually, Mr. Smith remains a child. (See generally Psych Report). He lived with his grandmother. He had been unemployed for two years at the time of the offense, and previously only had brief part-time jobs. (PSR, paras. 94-96).

Mr. Smith had only one friend, whom he never met in-person but only online. (Psych Report at 8; PSR, para. 65). The only other people Mr. Smith had considered friends, a co-workers at his brief part-time Target job, gave Mr. Smith dangerous drugs without his knowledge and robbed him. (PSR, paras. 68, 84, Addendum part 5; Psych Report at 8). It was this incident that led to Mr. Smith's prior juvenile offense where he was hallucinating due to the drugs, and fired a gun in his bedroom believing his grandparents were in danger. (PSR, paras. 54, 84, Addendum part 5; Psych Report at 10). Mr. Smith has never had a romantic or intimate relationship or friendship with a woman. (Psych Report at 8-9).

Mr. Smith spent most of schooling in special education where he was bullied and felt completely isolated and which resulted in very low self-esteem; he eventually finished

3

high school online. (PSR, paras. 65, 68, 74, 87-91; Psych Report at 3. 8, 9). He was

diagnosed by psychologists in school, an outside clinic, and by the forensic psychologist

retained in this case with ADHD, Anxiety Disorder, learning disabilities, obsessive

compulsive disorder, depression, emotional/behavioral disorders, and features of autism

spectrum disorder.  (Psych Report at 1, 8; PSR, paras. 73-78).

     Mr. Smith grew up in an unstable and unhealthy family situation. His parents

divorced when he was an infant. (PSR, para. 61). His father was absent morst of his

childhood. (Id.) Mr. Smith's mother was physically and emotionally abusive, and was

volatile and unpredictable apparently stemming from drug addiction. (PSR, para. 62,63

65, 68). His mother would abruptly kick Mr. Smith out of the house beginning when he

was as young as nine. (PSR, para. 62). When she wanted Mr. Smith to return, his mother

would threaten to contact police. (Id.) Mr. Smith went back and forth between the homes

of his mother and maternal grandparents as a younger child, and then lived primarily with

his grandparents from high school until his arrest in this case. (PSR, para. 62).

     Mr. Smith always had infrequent contact with his father, sometimes visiting during

summers but with long stretches of no contact at all. (PSR, para. 63). His  father was

emotionally abusive. (PSR, para. 65). At one time when Mr. Smith was at his father's

home, he was severely bitten by his father's dog. (PSR, para. 71). His father refused to get

Mr. Smith medical treatment. (PSR, para. 71). He was finally hospitalized when he

returned to his mother's home due to a severe infection which caused him to almost lose

his arm. (Id.) Shortly before his arrest, Mr. Smith's father told him after his sister Sunny had died of a drug overdose, "I wish it had been you that had died." (Psych Report at 9; PSR, paras. 64, 65).

Mr. Smith has no history of violence, either in his criminal history or otherwise. His father took Mr. Smith hunting at the age of 13, Mr. Smith refused to shoot, and his father called him a "pussy.". (Psych Report at 4, 5). Mr. Smith had never been in a real-life fight (until an incident in the jail where he was attached). (Psych Report at 4, 14-15; Suppl. Psych Report at 2).

At the time of the offense, Mr. Smith's life consisted of playing video games, surfing and interacting on the internet, and playing out is fantasies from video games at the shooting range. His fascination with firearms and war was "mixed in with a rich fantasy, almost cartoon-like interest in video games and 'war' culture play." (Psych Report at 14).[2] Mr. Smith was starved for actual friendship. (PSR, para. 65).

Prior to intervention by FBI informants, Mr. Smith's interest in firearms was strictly a hobby. (Psych Report at 15). Mr. Smith's grandmother purchased his collection of firearms and ammunition. (PSR, para. 22; Psych Report at 16). His ambition was to become a gunsmith, and he had enrolled in a program in earlier 2022 before withdrawing

---

[2] Although the PSR contains a long section on "Previous Communications and Internet Activity" where Mr. Smith spend substantial time online researching information and engaging in discussions about weapons and violence, and expressing prejudices against various groups, there is no evidence of any serious intention of carrying out any violence much less specific plans.

due to struggles with ADHD. (PSR, para. 92). Mr. Smith's carried further carried out his fascination with firearms and weapons by going to a shooting range where he wore tactical gear and engaged in tactical movements.[3] (PSR, para. 7). Mr. Smith had specifically asked permission from an owner of the shooting range to engage in tactical drills and use tactical gear before doing so. (PSR, para. 37).[4]

A retired law enforcement officer observed Mr. Smith's conduct at the shooting range, reportedly found it to be strange, and reported Mr. Smith to the FBI.[5] The FBI responded by first arranging for a confidential informant to initiate contact with Mr. Smith on social media. (PSR, para. 9). The informant claimed to be a female who knew Mr. Smith from high school and initiated lengthy text conversations. (Id.) Given Mr. Smith's lack of any social life, he was obviously excited that a young woman his age was interested in him. The informant begins by asking Mr. Smith about drug use, and he states

---

[3] The PSR notes that Mr. Smith wore a "punisher" mask which is identified with extremist groups. (PSR, para. 8). Mr. Smith wore the mask to imitate a video game rather than to identify with any extremist group. He pointed this fact out in his objections to the preliminary PSR. (Doc. 73 at 1). The revised PSR did not make the requested change but noted the objection in Addendum while taking out of context Mr. Smith's statement to the FBI informant that he wore the mask for warmth while adding, "I guess it means you're a racist too" to mean that he wore the mask in order to be a racist. PSR, para. 16, Addendum A.2). This is one example of the PSR twisting Mr. Smith's statements to attribute meaning that is not evident.

[4] Mr. Smith also adds that he sometimes engaged in tactical movements at the shooting range in the presence of another person whom he knew to be a law enforcement officer.

[5] Mr. Smith understands this officer to be from the Savage police department who had involvement in Mr. Smith's prior offense.

that he does not use. Mr. Smith then gets into discussing his interest in guns. The informant discusses her brother and father's interest in guns and how they hate the

government, and then prods Mr. Smith for his political views. The informant then brings her father who "hates everyone [emoji] Black, Hispanic." Mr. Smith responds, "I am not that extreme" but dislikes one group. (PSR, para. 9).  The informant presses Mr. Smith about the group he dislikes. Mr. Smith then shares prejudice views about various groups. They have further text discussions about weapons. Mr. Smith never expresses any intention of harming anyone or committing crimes to the first informant.

The day after the first FBI informant initiated a text conversation with Mr Smith, the FBI sends a second informant to the shooting range. (PSR, para. 12). The second informant stationed himself next to Mr. Smith. (Id.) The informant shot a gun with a binary trigger. (Id.) A binary trigger enables a firearm to shoot rounds with both the trigger pull and release, thereby allowing the shooter to fire twice as many rounds. (Id.) the ATF has taken the position that the Rare Breed or binary trigger used by the informant is a machine gun.[6] The FBI informant succeeded in piquing Mr. Smith's curiosity about the binary trigger as Mr. Smith proceeded to inquire about it and how it compared to an

---

[6] https://apnews.com/article/rapid-fire-triggers-rare-breed-ef6fbc7520b719e8f5ff3fa312a6fae0#:~:text=In%20court%20documents%2C%20the%20company,ATF%20to%20evaluate%20the%20devices. The PSR Addendum dismissed the defense "incorrectly inflating [*sic*] it [binary trigger] with a forced reset tigger." (PSR, Addendum at A.2). The PSR ignored the stated point that it has nevertheless been defined as a machine gun, as well as the underlying point that a binary trigger appears similar to an auto sear.

automatic weapon. (PSR, para. 12). Mr. Smith described the binary trigger as "candy in front of me." (PSR, para. 38). The informant told Mr. Smith that an auto sear is an easier way to shoot a lot of bullets, and Mr. Smith then expressed interest in an auto sear. (Govt. FD-1023 Report by Jason Bujold regarding 11/16/20222 contact with CHS, dated 11/18/2022, Govt. Bates # 00000201).[7]   The government's transcript of Mr. Smith and the informant's conversations on November 16 and 17, 2022 documents the informant telling Mr. Smith about an auto sear and offering to sell him one for $120:

> RS      Yeah. [noise] I wanna get a-I don't know what the name of it is. It's like uh ... little metal piece you put in the back, you know? And then it's just full auto only.
> CHS    Auto-sear.
> RS      Yeah. Yeah.
> CHS    You want an auto-sear?
> RS      I-I do. Honestly, cuz it's like-I'm at the point to where like, m-my shit's already all legal, dude, so if they come for me, dude, I may as well. Even though it's not that useful dude, if you get them in the car dude-ah dude fucking pwhwhwhwhww. There's--
> CHS    [OV] You give me a hundred twenty bucks, I'll get you an auto-sear. And I'll get you a real one made out of metal.

(Govt. Disclosure, Bates #00001573).

The PSR summarizes discussions by Mr. Smith with the informant about extremist groups and views. (PSR, paras. 13-14). The PSR leaves out that it was the informant (CHS2) who initiated the topics including expressing support for extremist groups and

---

[7]   The PSR states that FBI agents instructed the informant after the November 16, 2022 encounter not to bring up auto sears unless Mr. Smith initiated the topic. (PSR, para. 12). This narrative misleadingly implies that the informant did not bring up auto sears to Mr. Smith. The defense advised probation of this error, (Doc. 73 at 1) but the revised PSR did not include any correction or even acknowledgment of the defense objections.

making racist statements, including use of the N-word, which Mr. Smith himself refused

to use.[8]  It was in response to the informant's expressed interest in extremist groups that

Mr. Smith brought up The Base. The probation officer refused to revise the PSR with

further clarification that there is no evidence of any connection between Mr. Smith and

The Base, and that at the next meeting the informant asked Mr. Smith about going to The

Base, Mr. Smith responded that he did not know anyone in the group, whether it even

existed anymore. (Govt. Disclosure, Bates #00001517).

At meetings at the shooting range on November 16 and 28, 2022, the informant

repeatedly brought up the topic of tannerite explosives. (Govt. Disclosure Bates

#00001538, 1571, 1593). Mr. Smith responded by expressing interest in grenades, which

the informant eventually offered to sell to Mr. Smith.

The informant eventually arranged on behalf of the FBI to meet with Mr. Smith to

sell him three auth sears and three grenades on December 14, 2023. Mr. Smith met with

the informant, took possession of the items and was arrested shortly thereafter.

Notwithstanding Mr. Smith's discussions with the informant about expectations of having

a violent confrontation with police, he offered no resistance to his arrest despite having a

loaded handgun, and wearing soft armor. (PSR, para. 20).

---

[8]  The PSR asserts that this information is not in the government's materials, but it is
in the government's transcripts of the conversations. (Govt. Disclosure, Bates #s 00001523,
00001579, 00001477).

The PSR summarizes multiple recorded jail phone conversations between Mr. Smith and his grandmother following his arrest and after his plea of guilty. (PSR, paras. 29-33). There are many hundreds of phone calls between Mr. Smith and his grandmother. In the phone calls cited by the government, Mr. Smith questions whether he should have resisted the police, expresses doubts about whether he is really guilty or did wrong, disagrees that there is justification for a lengthy prison sentence, discusses thoughts about leaving the country, joining the Russian army or challenging the government after his release from prison, and in one instance of frustration threatens his grandmother. (Id). Mr. Smith has explained that he has been extremely upset about the situation, has been suffering from his diagnosed anxiety disorder which was not being adequately medicated, and was venting. There is no evidence that Mr. Smith has done anything beyond venting. He in fact calmed down after he started receiving effective medications in approximately August. Mr. Smith's grandmother explained that she understood him to venting and did not take his statements seriously. (PSR, para. 68). At summarized in the PSR, Mr. Smith's grandmother

> emphasized that he has never been violent and believes he may have "got carried away talking about things once in a while," which is something she would also expect given his relatively young age. Regarding his jail calls, she knows he was struggling to adjust when he was in custody and believes that not immediately receiving his necessary medication contributed to him "go[ing] off on his tangents,"

(Id.)

Dr. Mark Kleiman, a forensic psychologist engaged to conduct an evaluation in this case, prepared an extensive analysis where he explains how a multitude of issues including multiple diagnosed psychological disorders of anxiety disorder, ADHD, and features of autism, as well as his social isolation made Mr. Smith vulnerable to being influenced by the government informants. (Psych Report at 8).  Further, "his lack of skills, and any real life experience negotiating interpersonal 'space' left him particularly vulnerable to a 'female' informant." (Psych Report at 9). Mr. Smith's further traumatic experiences including his sister's death from a drug overdose, emotional abuse and manipulation by his father, abuse by his mother, and the robbery he experienced in 2019, "deepened his level of mistrust, social isolation, and vulnerability to the defendant-informant interactions leading to his arrest on the current charges." (Id.) Dr. Kleiman concluded based on commonly used and accepted testing methods that Mr. Smith's "overall risk level is Low/Moderate." (Psych Report at 14). Dr. Kleiman concluded not just that Mr. Smith presented a low risk of violence while incarcerated, but upon release, his risk of violence "will be low/moderate." (Psych Report at 16). Dr. Kleiman cites strengths including Mr. Smith's "avid love of reading and genuine desire to please others" (Psych Report at 8), and that he wants treatment and is likely to be compliant in treatment. (Psych Report at 13).

Dr. Kleiman had a follow up interview with Mr. Smith on September 26, 2023 since his interviews for the original report were in March. Dr. Kleiman found that Mr.

Smith was "more stable, and focused as he spoke" and had "improved social skills."
(Suppl. Psych Report at 1,2 ). In response to questioning about the threats he made to his
grandmother, Mr. Smith state, "I horribly regret that." (Id. at 1)  Dr. Kleiman found that
Mr. Smith "sounded sincere and remorseful." (Id. at 2). Dr. Kleiman concluded that Mr.
Smith's "threats made to his grandmother should be considered evidence of his
developmental immaturity, and not serious in any meaningful way." (Id.) After reviewing
new information about the phone calls, Dr. Kleiman states, "the conclusions made in my
original evaluation have not changed." (Id.)

Mr. Smith has been taking advantage of therapy groups offered in jail, including a
psychoeducation group and a dialectical behavioral therapy group, and has participated in
one on one therapy. (PSR, para. 80).

## III.    MR. SMITH HAS EARNED ACCEPTANCE OF RESPONSIBILITY

The PSR unjustifiably recommends that Mr. Smith not receive the three level
reduction in his offense level for acceptance of responsibility despite his admission of all
elements of the offense at the change of plea hearing, and his further admission and
expression of remorse duirng the presentence investigation interview. Mr. Smith
explained in detail to the police officer how be became interested in firearms, his activity
at the shooting range, and how he came to be interested in purchasing an auto sear after
seeing the informant shooting with a binary trigger. (PSR, paras. 36-38).  He expressed an

12

understanding that he can no longer be around firearms and intends to follow the law and terms of supervised release. (PSR, para. 38).

Mr. Smith renounced his previously expressed racist views, explaining that his exposure in jail to people of different races  and religions caused him realize his stereotypes were wrong. (PSR, paras. 38, 39). Mr. Smith also explained that some of the prejudiced or extremist views attributed to him were misunderstood. He never identified with Nazis, but his beliefs are the opposite based on his grandfather having fought in World War II. (PSR, para. 38).  His controversial statements on the internet were intended as "shock humor" without the intent of hatred or plans to commit violence. (PSR, para. 39). Mr. Smith does not make any secrets that he continues to not like the government. There is no requirement that he profess affection for the government as a requirement for acceptance of responsibility.

The PSR fails to set forth any examples of any statements that Mr. Smith made at his change of plea hearing or to the probation officer which were false. The PSR relies on Mr. Smith's phone calls earlier in the case where he allegedly stated that he would like about pleading guilty and lie to the probation officer. The latter attribution about Mr. Smith stating he would lie to the probation officer has been misrepresented or misinterpreted. Mr. Smith's actual statement was that he would not divulge any information that was not asked for. In any event, there is no evidence that Mr. Smith did lie. He has told the truth to both the Court and the probation officer.

13

The PSR also cites a disciplinary incident arising from a large fight in jail in which Mr. Smith was involved. (PSR, para. 40). Mr. Smith has explained that he was attacked during the incident and was only defending himself. There is no evidence to the contrary. Mr. Smith was bleeding and needed medical attention. The inmate who attacked him was not injured. This incident is clearly insufficient to justify denial of acceptance of responsibility. There is no evidence that Mr. Smith did anything that could be a violation of any law.[9]

The PSR fails to cite any specific criteria set forth in the Sentencing Guidelines that are applicable to the determination of acceptance of responsibility that Mr. Smith has failed to meet. U.S.S.G. § 3E1.1, Application Note 1, sets forth the following considerations:

> 1.   In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:
>
> > (A)  truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility, but the fact that a defendant's challenge

---

[9]  Jail rule typically prohibit any participation in a fight regardless of whether the inmate was not an aggressor or just defending himself.

is unsuccessful does not necessarily establish that it was either a false denial or frivolous;

There is no suggestion that Mr. Smith has not truthfully admitted his conduct underlying the offense, or falsely denied any relevant conduct.

(B)   voluntary termination or withdrawal from criminal conduct or associations;

Mr. Smith is not alleged to have engaged in any criminal conduct since his arrest. His only criminal association was with the FBI informant who sold him the auto sears, so there was no other association to withdraw from. As previously stated, his inadvertent involvement in a jail fight where the other inmate was the aggressor and Mr. Smith merely defended himself does not constitute criminal conduct. This situation does not compare to cases where acceptance of responsibility was denied based on actual criminal conduct. See United States v. Theson, 2023 U.S. App. LEXIS 5697, *2-3 (8th Cir. 2023)(Defendant robbed and assaulted other inmates and forged a document while in custody); United States v. Cooper, 998 F.3d 806, 807-808 (8th Cir. 2021)(The defendant was part of a group of three inmates who participated on a premeditated assault on another inmate which consisted of using trickery to enter the inmate's cell and then stabbing the inmate); United States v. William, 681 F.3d 936, 939 (8th Cir. 2012)(Defendant participated in a robbery while on pretrial release and then attempted to manufacture exculpatory evidence from jail); United States v. Arellano, 291 F.3d 1032,

1035 (8th 2002)(Defendant assaulted a correctional officer in jail). Mr. Smith's incident

does not approach these situations.

Smith's venting in phone calls, although unsettling, is not alleged to be criminal

conduct.

(C)   voluntary payment of restitution prior to adjudication of guilt;

There is no restitution claimed.

(D)   voluntary surrender to authorities promptly after commission of
the offense;

This is not applicable because Mr. Smith was arrested immediately.

(E)   voluntary assistance to authorities in the recovery of the fruits
and instrumentalities of the offense;

This is not applicable as all items were seized from Mr. Smith's person, vehicle or

home after his arrest.

(F)   voluntary resignation from the office or position held during
the commission of the offense;

This is not applicable.

(G)   post-offense rehabilitative efforts (e.g., counseling or drug
treatment); and

Mr. Smith has completed two therapy groups and engaged in one on one therapy.

(H)   the timeliness of the defendant's conduct in manifesting the
acceptance of responsibility.

Mr. Smith plead guilty prior to the pretrial motions hearing and despite the government's refusal to even propose a plea agreement.

Mr. Smith has earned acceptance by admitting and taking responsibility for his conduct at the plea hearing and in his formal interview by the probation officer. That is what is required for acceptance. Mr. Smith has further engaged in rehabilitative efforts including mental health therapy groups and individual therapy, and participating in interviews with a forensic psychologist evaluating Mr. Smith. The other conduct cited by the probation officer does not rise to the level of conduct that can justify denial of acceptance. His jail phone calls, although unsettling, are not alleged to be crimes but are at most expressions of anger and frustration. There is no evidence that Mr. Smith's jail disciplinary incident rises to the level of criminal conduct or would even be deemed wrongful outside of a jail setting. Mr. Smith made a decision to plead guilty and take responsibility early in the process with the understanding that it would mitigate his sentence including through a substantial reduction in his offense level. Out of fairness to Mr. Smith and well as to further the interests of the court system to encourage prompt guilty pleas, Mr. Smith's reasonable expectation of an offense reduction should be fulfilled.

**IV.    ENHANCEMENTS FOR DISMISSED GRENADE CHARGE ARE IMPROPER.**

17

The PSR recommends two 2 level increases based on Mr. Smith's alleged purchase of inert grenades. (PSR, paras. 43-44). It is not appropriate to increase Mr. Smith's offense level based on a charge that was dismissed because it did not constitute a crime.

**A.**     **Number of Firearms**.

The PSR's first recommended increase is based on the offense allegedly involving 3-7 firearms pursuant to U.S.S.G. § 2K2.1(b)(1).  The PSR astutely notes that auto sears which Mr. Smith plead guilty to, do not qualify as "firearms" for purposes of this guideline provision which is based on the definition set forth in 18 U.S.C. § 921(a)(3). Mr. Smith therefore cannot receive this two level increase based on the items underlying his offense.

The PSR instead seeks to apply the increase based on the inert grenades which are not part of the offense of conviction. Mr. Smith cannot be held liable for three "grenades" that in reality never existed, and where the underlying charge has been dismissed. Since the purported grenades delivered to Mr. Smith were inert, they are not actually grenades or destructive devices.  Mr. Smith was therefore not charged in the indictment with possessing grenades, but with an **attempt** to receive or possess destructive devices and not recording them in the national registry. (See Indictment, Count 2, Doc. 17). The government was subsequently  compelled to dismiss this charge because there is no crime for attempting to receive or possess a destructive device as charged in the Indictment. (See Defendant's Memorandum Regarding Upcoming Plea, Doc. 60). The charge relating

18

to the fake grenades was not dismissed pursuant to any plea agreement but because it was

not a valid criminal charge. It is therefore not proper to deem such non-criminal conduct

as "relevant conduct."[10]  It would be improper to rely on such non-criminal conduct to

increase Mr. Smith's sentence.

The PSR addendum invokes U.S.S.G. § 2K2, Application Note 5, which states,

"For purposes of calculating the number of firearms under subsection (b)(1), count only

those firearms that were unlawfully sought to be obtained, unlawfully possessed, or

unlawfully distributed, including any firearm that a defendant obtained or attempted to

obtain by making a false statement to a licensed dealer." As the PSR itself acknowledges,

there is no statement in this note that inoperable grenades qualify as "firearms" or

destructive devices under this provision.

The PSR next relies on the statutory definition of destructive device under 18

U.S.C. § 5845(f) which includes ""any combination of parts either designed or intended

for use in converting any device into a destructive device as defined…and from which

any destructive device may be readily assembled." The PSR then acknowledges that

insufficient evidence has been provided to determine whether the inert "grenades" could

have been readily assembled into a destructive device. But this statutory provision is

inapplicable to the sentencing guideline provision at issue. As the PSR previously points

_____

[10] U.S.S.G. § 1B1.3, Application Note 1 provides, "the focus is on the specific acts
and omissions for which the defendant is to be held accountable in determining the
applicable guideline range."

out, the definition of firearms for purposes of U.S.S.G. § 2K2.1(b)(1) is set forth 18

U.S.C. § 921(a)(3). This statutory provision includes "grenades," without any further

language suggesting the grenade parts or inert grenades would be included.

The PSR points out that there is no Eighth Circuit case law addressing the issue at

hand. It cites a Fifth Circuit decision, United States v. Maturino, 887 F.3d 716, 723 (5th

Cir. 2018) which held that inert grenades could be counted on the grounds that they were

"sought to be obtained." This Court should reject the reasoning in Maturino because it

fails to address the question of whether one can seek to obtain firearms or destructive

devices that are not in fact firearms or destructive devices in the first place. Maturino is

further distinguishable from the instant case because it involved a defendant who did

obtain a real grenade and plead guilty to unlawful possession of a live grenade. The inert

grenades in Maturino were therefore part of the relevant conduct. In the instant case, Mr.

Smith did not plead guilty to any offense involving grenades and the charge pertaining to

the grenades was dismissed.[11]  There is further no plea agreement in which the inert

---

[11]  Mr. Smith further asserts for purposes of the record that to rely on acquitted or
dismissed conduct for sentencing purposes violated his Fifth and Sixth Amendment rights.
Although United States v. Watts, 519 U.S. 148, 156-57, 117 S. Ct. 633, 136 L. Ed. 2d 554
(1997) has held to the contrary, distinguished jurists have called Watts into question. See,
e.g., United States v. Jones, 574 U.S. 948, 135 S. Ct. 8, 8-9, 190 L. Ed. 2d 279 (2014)
(Scalia, J., joined by Thomas, J., and Ginsberg, J., dissenting from denial of certiorari)
(encouraging the Court to decide whether the Due Process Clause and the Sixth
Amendment's jury trial right permit judges to sentence defendants based on uncharged or
acquitted conduct); United States v. Sabillon-Umana, 772 F.3d 1328 (10th Cir. 2014)
(Gorsuch, J., majority) (citing Justice Scalia's dissent in Jones); United States v. Bell, 808
F.3d 926, 928, 420 U.S. App. D.C. 387 (D.C. Cir. 2015) (Kavanaugh, J., concurring in denial
of rehearing en banc) ("Allowing judges to rely on acquitted or uncharged conduct to impose

grenades are discussed as part of the offense conduct. The inert grenades are therefore not part of the relevant conduct and cannot properly be considered as part of Mr. Smith's sentence.

### B.      Destructive Devices.

The PSR next recommends an additional 2 level enhancement on the grounds that the offense involved a destructive device pursuant to U.S.S.G. § 2K2.1(b)(3)(B). As previously stated, the government has dismissed the charge relating to attempted possession of a destructive device. The dismissal was not pursuant to any plea agreement where the charge could have still been deemed relevant conduct, but because there was no crime committed. As also previously stated, it is unconstitutional to enhance Mr. Smith's sentence based on dismissed conduct. Mr. Smith's alleged attempt to obtain grenades without registering them does not violate any criminal statute. Mr. Smith's sentencing guidelines cannot be properly enhanced based on a dismissed charge where the underlying conduct did not violate any law. There was no crime because by definition, an

---

higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial."); McClinton v. United States, 143 S. Ct. 2400, 2401 (2023)(Sotomayer dissenting in denial of certiorari)("use of acquitted conduct to increase a defendant's Sentencing Guidelines range and sentence1 raises important questions that go to the fairness and perceived fairness of the criminal justice system")(Concurrence of Kavanaugh, Gorsuch and Barrett - "the Sentencing Commission is currently considering the issue. It is appropriate for this Court to wait for the Sentencing Commission's determination before the Court decides whether to grant certiorari in a case involving the use of acquitted conduct.")

inert grenade is not a destructive device, and the charged offense does not encompass attempts.

**V.   THERE IS NO BASIS FOR UPWARD DEPARTURE FOR UNDERSTATED CRIMINAL HISTORY.**

The PSR recommends an upward departure for understated criminal history pursuant to USSG §4A1.3(a). (PSR, para. 118). This recommendation is a desperate attempt to find grounds to increase Mr. Smith's sentence as there is nothing in his criminal history that would justify an upward departure.  USSG §4A1.3(a)(2) list specific types of prior conduct that qualifies for this upward departure under this provision:

(2)    TYPES OF INFORMATION FORMING THE BASIS FOR UPWARD DEPARTURE.—The information described in subsection (a)(1) may include information concerning the following:

(A)    Prior sentence(s) not used in computing the criminal history category (e.g., sentences for foreign and tribal convictions).

This provision is not applicable as Mr. Smith has no such prior sentences.

(B)    Prior sentence(s) of substantially more than one year imposed as a result of independent crimes committed on different occasions.

This is not applicable as Mr. Smith only has one prior sentence, and it was not more than one year.

(C)    Prior similar misconduct established by a civil adjudication or by a failure to comply with an administrative order.

This is not applicable.

(D)    Whether the defendant was pending trial or sentencing on another charge at the time of the instant offense.

This is not applicable.

> (E)    Prior similar adult criminal conduct not resulting in a criminal conviction.

There is no such allegation.

Application Note 2(A) also provides specific examples of grounds for upward departures:

> (i)    A previous foreign sentence for a serious offense.
> (ii)    Receipt of a prior consolidated sentence of ten years for a series of serious assaults.
> (iii)    A similar instance of large scale fraudulent misconduct established by an adjudication in a Securities and Exchange Commission enforcement proceeding.
> (iv)    Commission of the instant offense while on bail or pretrial release for another serious offense.

None of these are remotely applicable.

Mr. Smith has one prior juvenile adjudication that does not include any of the five categories of information listed in the guideline and does not approximate any of the examples listed in the application note. The common theme underlying this departure is that a defendant engaged in other crimes or criminal misconduct that did not receive any points, or did not receive enough points to accurately reflect its seriousness.  Mr. Smith's one prior juvenile adjudication for a low level offense properly received one criminal history point. He is not alleged to have committed any other crimes or criminal misconduct that did not result in criminal history points. It should also be noted that Mr. Smith's prior juvenile offense was not egregious based on either the law or the facts. Mr.

Smith was unknowingly given dangerous drugs by people he thought were friends in

order to rob him. In response to his victimization and hallucination, he discharged a

firearm. No one was seriously injured. It was Mr. Smith himself who called police to

report the incident. Mr. Smith fully complied with probation and was discharged. There is

nothing about the prior offense which would justify enhancing his criminal history

beyond what the guidelines call for. There is nothing about the offense which suggests

Mr. Smith is such a dangerous person that he needs to be treated as a repeat criminal even

though he is not.

The PSR again cites Mr. Smith's statements in recorded jail phone calls as a basis

for this proposed upward departure. The problem is that his jail phone calls do not violate

any criminal statutes much less give rise to criminal charges, and are unrelated to his

criminal history. The PSR's offense at Mr. Smith's non-criminal statements are not

grounds for inventing upward departures.

## VI.   THERE IS NOTHING EXCEPTIONAL ABOUT THE CASE WARRANTING AN UPWARD DEPARTURE UNDER USSG § 5K2.0(a)(1)(A).

The PSR next recommends an upward departure under U.S.S.G. § 5K2.0(a)(1)(A)

based on aggravating circumstances not adequately taken into account by the Sentencing

Commission. (PSR, para. 119). It is again grasping at straws to find grounds to increase

Mr. Smith's sentence beyond the actual severity of his offense. Mr. Smith's statements

that the PSR deems distasteful do not transform this into an "exceptional case" that would

bring this rarely used provision into effect. The PSR fails to address the strict limitations

set forth for a departure under this provision:

> The court may depart from the applicable guideline range based on a
> combination of two or more offender characteristics or other circumstances,
> none of which independently is sufficient to provide a basis for departure,
> only if—
>> (1)    such offender characteristics or other circumstances, taken
>> together, **make the case an exceptional one**; and
>> (2)    each such offender characteristic or other circumstance is—
>>> (A)    present to a substantial degree; and
>>> (B)    identified in the guidelines as a permissible ground for
>>> departure, even if such offender characteristic or other
>>> circumstance is not ordinarily relevant to a determination of
>>> whether a departure is warranted.

U.S.S.G. § 5K1.0(c)(emphasis added). The PSR does not set forth two or more offender

characteristics or circumstances that would make this case an "exceptional one" or that

are identified in the guidelines as a permissible grounds for a departure.

The grounds set forth in the PSR are further inappropriate grounds for an enhanced

sentence.  The only basis set forth in the body of the PSR is that the guidelines do "not

capture the concerning statements and viewpoints he has held, both before and during his

encounters with the cooperating sources in this case." (PSR, para. 119). This is only one

circumstance, not two or more. Further, there is presumably a good that a defendant's

political statements and viewpoints are not included in the guidelines as a grounds for an

enhancement or upward departure: it would be a violation of a defendant's First

Amendment Right to Free Speech. The PSR is incredibly advocating that Mr. Smith

receive a higher sentence because it disapproves of his social or political views.

The PSR takes offense to Mr. Smith's commentary about different groups, and his antagonistic views towards the government and law enforcement. Speech on issues that are a matter of public concern "is entitled to 'special protection' under the First Amendment. Such speech cannot be restricted simply because it is upsetting or arouses contempt." Snyder v. Phelps, 562 U.S. 443, 458 (2011). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Texas v. Johnson, 491 U.S. 397, 414, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989).

Mr. Smith is being prosecuted for and has pled guilty to possession of auto sears which are defined as "machine guns" under federal statute. The charged statute does not include any elements pertaining to a defendant's social or political views. The sentencing statute and sentencing guidelines, with good constitutional reasons, do not include criteria relating to social or political views. It is also an undisputed fact that Mr. Smith never carried out or made any specific plans to carry out any criminal actions pertaining to his statements before or after the offense. It is inappropriate and impermissible increase Mr. Smith's sentence based on his statements.

The Addendum to the PSR further suggests an upward departure under § 5K1.0 is warranted if the Court determines that the inert grenades do not qualify as destructive devices for purposes of an offense level enhancement. This is another impermissible basis

to apply § 5K1.0 because it is not a factor that the guidelines fail to take into account. It is factor that the guidelines specifically considers, and based on the defense position, does not apply under the specific circumstances of the offense.  § 5K1.0 is specifically not intended as an alternative permit the Court to apply an enhancement that it has determined is not applicable.

## VII.   RECOMMENDED SUPERVISED RELEASE ARE OVER-RESTRICTIVE AND VIOLATE MR. SMITH'S FIRST AMENDMENT RIGHTS.

The PSR recommends conditions of supervision that fundamentally interfere with Mr. Smith's First Amendment rights, including restricting possession of materials reflecting views that probation deems inappropriate, prohibiting use of internet, social media and relating communication applications without approval by probation and the Court, and prohibiting possession of computer or on-line services without probation approval as well as the unrestricted monitoring of any devices. (PSR, paras. 129-130, 132).

It is well established that "[w]hile a sentencing court has 'wide discretion' to impose special conditions of supervised release, such conditions must satisfy the requirements set out in 18 U.S.C. § 3583(d)." United States v. Perrin, 926 F.3d 1044, 1047 (8th Cir. 2019)(quoting United States v. Durham, 618 F.3d 921, 944 (8th Cir. 2010) (quoting United States v. Crume, 422 F.3d 728, 732 (8th Cir. 2005))). The 8th Circuit has set forth the following criteria for evaluating conditions of supervised release:

> First, the special conditions must be reasonably related to five matters: the nature and circumstances of the offense, the defendant's history and characteristics, the deterrence of criminal conduct, the protection of the public from further crimes of the defendant, and the defendant's educational, vocational, medical or other correctional needs. Second, the conditions must involve[] no greater deprivation of liberty than is reasonably necessary to advance deterrence, the protection of the public from future crimes of the defendant, and the defendant's correctional needs. Finally, the conditions must be consistent with any pertinent policy statements issued by the sentencing commission.

Crume, 422 F.3d at 733. The conditions at issue fail to meet any of these criteria. Mr. Smith has not committed any crimes using computers or the internet, or through his reading of any materials. The deprivation of liberty from banning Mr. Smith from reading what probation finds objectionable to greatly restricting his internet use is far greater than necessary to advance deterrence or protection of the public. The PSR does not present any policy statements from the sentencing commission that support its proposed restrictions.

Even in cases of child pornography, the 8th Circuit has rejected complete internet bans. Crume at 733-34. The Supreme Court has held that it is unconstitutional to prohibit convicted sex offenders from accessing social networking sites. Packingham v. North Carolina, 582 U.S. 98, 107 (2017). In cases where the 8th Circuit has approved prohibitions on accessing the internet or using computers without approval of a probation officer, it has been because the defendant has a past history of using electronic devices as part of his offense conduct and while on supervised release. See United States v. Norris, 62 F.4th 441, 451 (8th Cir. 2023); United States v. Koch, 625 F.3d 470, 481-82 (8th Cir. 2010); United States v. Trimble, 969 F.3d 853,  857 (8th Cir. 2020). Mr. Smith did not

use computers or the internet to commit his offense. There is no evidence that he did anything illegal using computers or the internet. He has not yet been on supervised release so there is no way he could have any history of misconduct on supervised release.

It appears that almost all decisions reviewing internet restrictions are child pornography cases. It therefore likely that restrictions such as those suggested in the PSR are rare in cases that do not involve sex offenses. Mr. Smith is not accused of doing anything to endanger the public through his choice of reading materials or use of computers or the internet. The proposed restrictions are gratuitous, contrary to the applicable statutory criteria, and unconstitutional. They must be rejected.

## VIII.  APPLICABLE § 3553(a) FACTORS WARRANT A SENTENCE BELOW THE ADVISORY SENTENCING GUIDELINES.

Mr. Smith's personal history and struggles, and the circumstances of the offense warrant a downward variance rather than the PSR and government's requested upward variance from the advisory sentencing guidelines based on the applicable "reasonableness" factors set forth in 18 U.S.C. § 3553(a).  18 U.S.C. § 3553(a) provides that "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  After calculating the guidelines, a district court "may not presume that the Guidelines range is reasonable" but must make an independent assessment of the  18 U.S.C. § 3553(a) factors based on the individual facts of the case.  Gall v. United States, 128 S.Ct. 586, 597 (2007) .   A

sentence of 18 months in instant case is sufficient to address the purposes of federal sentencing.

Section 3553(a) sets forth the following factors that must be considered by a sentencing court in imposing every sentence:

(1)     *the nature and circumstances of the offense and the history and characteristics of the defendant;*

Mr. Smith acknowledges his offense and regrets his decision to purchase unlawful items from the undercover FBI informant. His acceptance of responsibility is demonstrated by his consistent admissions and his early plea even without the government's willingness to extend a plea offer. While the PSR and the government focus on Mr. Smith's statements and viewpoints expressed on the internet and to the FBI informant, the appropriate and permissible considerations are Mr. Smith's actual conduct and the circumstances that gave rise to his conduct. Regardless of how players in the process feel about Mr. Smith's views, he was engaged solely in lawful conduct prior to being approached by FBI informants. His activities on the internet were private, did not hurt anyone, and did not violate any laws. Mr. Smith's collection of firearms and his activities at the shooting range did not hurt anyone and did not violate any laws.[12]

Mr. Smith's life situation was overwhelmingly unfortunate. He grew up without a stable family. Both his parents were neglectful and abusive, and for the most part could

---

[12]   There may be some gray area with Mr. Smith relying on his grandmother to purchase firearms and ammunition, and the circumstances of his using them at the shooting range, but there was certainly no clear violation that could support criminal charges.

not care for and raise Mr. Smith. Mr. Smith bounced between his  mother and

grandmother, ultimately being raised mostly by his grandmother. He had learning

disabilities and mental health conditions that led to placement in special education from

an early age through high school. Mr. Smith subject to bullying and grew up with a low

opinion of himself. He suffered from ADHD, anxiety, and features of autism. His

disabilities led him to perform poorly in school. He eventually completed high school

online.

Mr. Smith grew up without friends. His only friend was someone he never met but

only interacted with on the internet. When Mr. Smith thought he had made friends while

working a part-time job at target, they unknowingly gave him drugs and robbed him. It

was while Mr. Smith was involuntarily under the influence of the drugs that he committed

his prior juvenile offense which consisted of discharging a gun in his home. Mr. Smith

successfully completed the conditions of probation for the offense.

At the time that the two FBI informants approached Mr. Smith, he was desperate

for a friend. The first informant claimed to be a girl. Mr. Smith had yet to have any

relationship with a female. The next informant posed as a fellow gun enthusiast who

approached Mr. Smith in the shooting range showing of his binary trigger. For Mr. Smith

it was candy. Mr. Smith, again desperate for a friend, discussed the firearms and

ammunition, discussed his social and political views in response to topics brought up by

both informants, and was responsive to the informant's hints and offers about auto sears and explosives.

Mr. Smith is not claiming innocense based on entrapment. It was his determined decision to enter into an early guilty plea. However, the circumstances of the offense contain strong features of entrapment. There is no indication that Mr. Smith was predisposed to obtain machine guns. He never had any before meeting the FBI informant. The informant at the very least communicated deliberate hints to Mr. Smith get him interested in auto sears and then grenades. The informant showed off the binary trigger, then told Mr. Smith about auto sears, and finally offered to sell them to Mr. Smith. Mr. Smith has plead guilty and continues to accept responsibility for his offense, but the strong features of entrapment based on a combination of the informant's conduct and Mr. Smith's vulnerabilities, are a strong mitigating factor.

Other strong mitigating factors are that Mr. Smith has never hurt anyone in his life. Prior to being attacked by another inmate in jail, he had never been in a physical altercation. His poor decisions in this case are strongly connected to his vulnerabilities including social alienation and mental health problems. The psychologist Dr. Kleiman has set forth that Mr. Smith does not pose a danger to the public. Mr. Smith further demonstrated in his interview with Dr. Kleiman and his decision to take every opportunity for therapy in jail that he is eager for treatment in order to address the problems that led to his offense.

(2)     the need for the sentence imposed–

    (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)     to afford adequate deterrence to criminal conduct;

    (C)     to protect the public from further crimes of the defendant; and

    (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

A bottom of the guidelines sentence of 18 months if the Court determines the guidelines in accordance with defense calculations, is sufficient to serve the purposes set forth above. If the Court comes with higher calculations, then a downward variance would be appropriate. This is Mr. Smith's first adult offense. His one juvenile offense was essentially an accident. As stated, he did not hurt anyone. Notwithstanding the FBI's intensive scrutiny of Mr. Smith's internet use and phone calls, there is no evidence of any specific plans to harm anyone. A lengthy sentence is not needed to adequately punish Mr. Smith and promote respect for the law in response to his purchasing a metal part that could convert a firearm into a machine gun.  His incarceration to date is already sufficient to deter Mr. Smith from committing any more crimes. He will benefit from educational or vocational training, and from mental health treatment, all of which can be best provided in the community while under the Court's supervision.

33

(3)      *the kinds of sentences available;*

The Court ultimately has discretion whether to impose prison or probation. By the time Mr. Smith is sentenced, he will have well over a year in custody which means he effectively has already served a prison sentence.

(4)      *the kinds of sentence and the sentencing range established for–*

     (A)      *the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .*

See above.

(5)      *any pertinent policy statement under the Sentencing Guidelines*

No policy statements are known that are specifically pertinent to this case.

(6)      *the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and*

Mr. Smith situation is not comparable to most firearms offenders because most have prior felonies. In the case of <u>United States v. Jay Olson</u>, D. Minn. Docket No. 22-158, the defendant sold an undercover informant 16 unserialized manufactured firearms, 9 high capacity magazines, a silencer, and an auto sear, and was also found in possession of material to manufacture additional firearms, his sentencing guidelines were 57-60 months and he received a sentence of 60 months. Mr. Smith's conduct was far less extensive, egregious or harmful because he was not manufacturing or trafficking firearms,

34

and had far fewer illegal items. Mr. Smith's sentence should be less than one-third Olson's sentence.

> (7)     *the need to provide restitution to any victims of the offense.*

This is not applicable.

## IX.   MR. SMITH SHOULD RECEIVE A DOWNWARD VARIANCE FOR EXTENDED TIME IN PRETRIAL DETENTION.

By the time of sentencing, Mr. Smith will have spent more than a year confined in the county jail. Mr. Smith continues to suffer a complete lack of fresh air, adequate air circulation, or adequate sunlight. Sherburne County Jail does not offer yard or outdoor access at any time.  The jail does not provide mentally or physically health conditions for a human, and offers substantially less than a federal prison. Mr. Smith's time in jail has been particularly difficult to his anxiety disorder combined with his lack of prior experience being incarcerated.

This Court has previously granted downward variances to account for time spend in pretrial custody. See e.g. United States v. Thomas, No. CR-07-2979 (DWF/JSM), 2012 WL 12896383, at *1 (D. Minn. Nov. 21, 2012), aff'd sub nom. United States v. White, 511 F. App'x 597 (8th Cir. 2013)(downward variance of 7 months to account for Defendant's pretrial custody in the Sherburne County Jail); United States v. Edmonds, No. CR-17-263(DWF/DTS), 2019 WL 4757652, at *5 (D. Minn. Sept. 30, 2019)("The Court exercised its discretion to credit Petitioner-Defendant three months for hard time served

in Sherburne County"). Mr. Smith respectfully requests a downward variance equivalent to 1 1/2 days for each day spent in pretrial custody.

## CONCLUSION

For the foregoing reasons, Mr. Smith respectfully requests that the Court recognize that Mr. Smith's offense conduct in unremarkable, he has not harmed anyone else, and does not pose a serious risk to public safety. His applicable sentencing guidelines are 18-24 months, and a sentence at the low end would be most appropriate. If the Court determines the guidelines to be higher, a downward variance to 18 months would be warranted.

Dated:  December 4, 2023                    LAW OFFICE OF JORDAN S. KUSHNER

By  s/Jordan S. Kushner
    Jordan S. Kushner, ID 219307
    Attorney for Defendant
    431 South 7th Street, Suite 2446
    Minneapolis, Minnesota  55415
    (612) 288-0545
    jskushner@gmail.com