UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal Case No. 23-CR-07 (DSD/JFD)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | **)** | |
| | ) | **DEFENDANT'S REPLY** |
| vs. | ) | **POSITION ON SENTENCING** |
| | ) | |
| RIVER WILLIAM SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

Defendant River William Smith, through undersigned counsel, hereby submits this reply to the government's position on sentencing (Doc. 87). The government's request for a ten year sentence for Mr. Smith is outrageous. Mr. Smith has never committed an act of violence or harmed anyone. This is his first adult criminal offense. At the time of his arrest Mr. Smith's life interests consisted of playing video games, browsing the internet and going to a shooting range. His biting bait from an FBI information to purchase auto sears does not make him a menace to society, and is not an offense any more serious - it is less serious - than what the normally applicable sentencing guidelines contemplate. The government's dislike for Mr. Smith's ideologies (some of which he has renounced), his interests and fantasies, and the fact that he does not like the government, are inappropriate considerations for sentencing. Such considerations certainly do not justify inapplicable enhancements and upward departures, or denying Mr. Smith benefits of pleading guilty and accepting responsibility.

## I.    FACTUAL CLARIFICATIONS

The government tries to portray Mr. Smith's conduct at the shooting range as troubling, but it is critical to note that his conduct was legal and did not endanger or threaten anyone's safety. Mr. Smith attempted to recreate action that he viewed on video games. As previously stated, Mr. Smith wore a punisher mask because he saw it on video games, and did not know it was identified with extremist groups. He specifically obtained permission from an owner of the shooting range to wear tactical gear and engage in tactical shooting drills. No one at the shooting range made any objections known to Mr. Smith. They apparently decided that it was worth his business.

It is undisputed that Mr. Smith did not attempt to obtain any illegal weapons prior to being approached by undercover FBI informants. The first informant, who texted Mr. Smith pretending to be a female who knew him from school, brought up topics relating to weapons and racist views. There is no dispute that Mr. Smith was very interested in weapons, which is legal, but did not express any interest in purchasing illegal items until approached at the shooting range by the second informant. Mr. Smith further wishes for the Court to recognize that the informant did not merely conduct shooting next to Mr. Smith as suggested in government and defense filings, but he forced interaction. The informant's vehicle was blocking the road to the part of the club where Mr. Smith had made his private reservation. Mr. Smith can be heard on the wire recording asking the informant would be there, in order to find out when Mr. Smith could have access to the area. As previously

2

explained, the informant was showing off his binary trigger which led to the discussion about auto sears which the informant recommended and then offered to obtain.

The government emphasizes and provides photos of the large quantity of weapons and gear that Mr. Smith had when he was arrested and at his home. There is no claim that any of these items were illegal or that Mr. Smith used them for any illegal purposes. Notwithstanding the focus on Mr. Smith's telling the informant about getting into an armed confrontation with the police, he made no attempt at resistance much less an armed confrontation at the time of his arrest. As the government points out, Mr. Smith explained in his Miranda interview that he intended to the auto sears and hand grenades he discussed purchasing to be "range toys."

## II.   ENHANCEMENTS FOR NUMBER OF FIREARMS AND DESTRUCTIVE DEVICES.

Mr. Smith relies on the analysis set forth in his original position pleading as to how fake grenades that were fake should not be counted as firearms, and further he should not be penalized for acquitted conduct. In addition, Mr. Smith refers the Court to United States v. Osuna, 189 F.3d 1289, 1294 (10th Cir. 1999) which held that it was plain error for the district court to count inert grenades as destructive devices for purposes of determining the number of firearms under § 2K2.1(b)(1). Osuna further held that it was plain error to treat inert grenades as destructive devices under the guidelines. Id. at 1295. Mr. Smith further calls the Court's attention to United States v. Blackburn, 940 F.2d 107 (4th Cir. 1991) which held that it was erroneous to count grenades lacking gun powder or sufficient gun powder to explode towards the number of firearms or as destructive devices under the Guidelines. Based on this persuasive authority, Mr. Smith should not receive enhancements for having three or more firearms or destructive devices.

### III.     UPWARD DEPARTURE FOR TERRORISM UNDER U.S.S.G. § 3A1.4, Note 4.

The government's requested departure for terrorism is wholly inapplicable where Mr. Smith neither engaged in nor made any specific plans to engage in any act of violence, and did not engage in conduct that remotely met the requisites for this departure. The government concedes that the terrorism enhancement under U.S.S.G. § 3A1.4 is inapplicable because Mr. Smith was not convicted of a crime of terrorism, but invokes Application Note 4, which provides,

> there may be cases in which (A) the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct but the offense involved, or was intended to promote, an offense other than one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B); or (B) the offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), but the terrorist motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

The government asserts that Mr. Smith's offense was "calculated to . . . retaliate against government conduct." (Govt. Position, Doc. 87 at 13). There is no evidence that remotely supports that Mr. Smith purchased auto sears to retaliate against government conduct. He purchased auto sears because he was excited from seeing the informant's binary trigger, and was interested in weapons. The government highlights Mr. Smith's statements to the informant that he could imagine a situation "in my lifetime" where the police would go after every semi-automatic weapon, and unlike other gun owners, he would not lay down but would resist to avoid giving up his guns. (Doc. 87 at 15-16).

4

There were a couple other conversations cited where Mr. Smith mentioned the possibility of armed confrontations with police. There were no specific plans articulated to engage in armed confrontations with police. There was merely speculation about hypothetical occurrences where Mr. Smith envisioned an armed confrontation. There was no calculation to retaliate against the government. Even the hypothetical situations Mr. Smith discussed do not fall within the rubric of terrorism. There is no discussion of using violence to advance or vindicate some larger political cause. He is merely talking about a desire to resist or defend himself in the hypothetical situation where the police try to take his guns or violate his rights.

It is also particularly significant that the government provides no mention by Mr. Smith of any plans to specifically use the auto sears he was purchasing for the purpose of getting into a shootout with police.  Whatever vague thoughts he entertained about a confrontation with police, they were connected to his existing gun collection (or grandparent's gun collection), and not the actual offense of purchasing auto sears. An example of a terrorist related offense could be where a defendant stated that he was purchasing auto sears or grenades in order to go to a police station and kill as many police as possible in revenge for some sort of government action that was disapproved of.  In this instant case, there was no specific plan of retaliation against the government, much less a plan to use the auto sears for retaliation against the government.

The government's focus about Mr. Smith's discussions of plans for a shootout with police is refuted by the fact that when Mr. Smith was arrested with weapons and body armor on his person and weapons in his vehicle, he made no attempt whatsoever to initiate a shootout but was arrested without resistance. His ruminations after the fact about whether he should have acted differently cannot change the fact that he did not engage in any violence against any representatives of the government and has never done so. Even the hypothetical shootout was discussed in the context of personal resistance, rather than any sort of plan for retaliation.

The cases that the government cites help demonstrate how far removed Mr. Smith's statements were from conduct deemed to be terrorism. The government's lead cite is United States v. Mohammed, 693 F.3d 192, 201 (D.C. Cir. 2012) where the offender planned to use the money from drug sales to facilitate attacks on U.S. and foreign forces in Afghanistan. In that case, the defendant was trying to involve himself in a war to oppose particular governments. In the instant case, Mr. Smith had no specific plans to attack any government but just contemplated resisting invasions of his rights. Further there was no specific connection between the auto sears and any specific plans. The government then cites the unpublished case in another district, United States v. Doggart, 2021 U.S. App. LEXIS 33024 (6th Cir. Nov. 3, 2021), where the defendant who was convicted of solicitation to destroy religious property planned to burn down buildings in the Muslim community and set in motion an armed insurrection against the U.S.

government. This is again an illustration of where there were specific plans to commit acts of violence with hateful and political motives, which were directly connected to the offense of conviction. None of these necessary factors are present in the instant case.

Various cases the rejected application of the terrorism enhancement under § 3A1.4 based on lack of evidence that the defendant intended to influence or retaliate against a government are more instructive. United States v. Alhaggagi, 978 F.3d 693 (9th Cir. 2020) held that the government failed to prove defendant had the necessary specific intent to commit a terrorism crime by distributing ISA propaganda on social media. Similar to the instant case, although the defendant endorsed extremist views and indirectly supported violent actions, there was no evidence that his crime was intended to directly influence or retaliate against a government.

United States v. Arcila Ramirez, 16 F.4th 844 (11th Cir. 2021) also held that it was erroneous to apply the terrorism enhancement where the defendant supplied firearm parts and components to foreign terrorist group but without proof that his conduct was calculated to influence or retaliate against a government. The instant case is even weaker where Mr. Smith purchased an auto sear strictly for personal reasons, and had no specific plans involving any government. A particularly instructive case is United States v. Ansberry, 976 F.3d 1108, 1126-29 (10th Cir. 2020), which held that it was error to apply the terror enhancement where defendant attempted to detonate a bomb in front of a police station in retaliation for prior actions of a town marshal where there was no evidence the

action was calculated to retaliate against a government. In the instant case, there was of course not even any attempt or specific plan to engage in any actual violent act, but even the contemplation of a confrontation with police related to resistance against police officers that Mr. Smith might hypothetically encounter and did not involve retaliation against the government. See also United States v. Jumaev, No. 12-CR-00033-JLK, 2018 WL 3490886, at *6 (D. Colo. July 18, 2018), aff'd, 20 F.4th 518 (10th Cir. 2021)(although the defendant was found guilty under 18 U.S.C. § 2339B, the terrorism enhancement does not apply because there was no **specific intent** to commit crimes calculated to influence or retaliate against a foreign government). Similarly in the instant case, Mr. Smith's hypothetical scenario's of possible confrontation do not approach any specific intent.

The government's request for an upward departure based on its incoherent attempt to connect Mr. Smith's offense with terrorism must be rejected. There is no basis for determining that Mr. Smith's purchase of auto sears was in any way a crime of terrorism. It is neither grounds for a departure or variance.

## IV.     ACCEPTANCE OF RESPONSIBILITY.

The government fails to demonstrate that Mr. Smith has not earned acceptance of responsibility. Mr. Smith's statements to family members at various times, which the government has spent enormous amounts of times listening to, where he expresses ambivalence or misgivings about his situation do not negate that he admitted his guilt in

court under oath and that he made a comprehensive statement to the probation officer acknowledging his guilty and reflecting on the circumstances. It does not negate his acceptance that he is angry about his situation and believes there is injustice in his case. It does not negate Mr. Smith's acceptance that he discusses plans to leave Minnesota after his release from prison. The Guidelines do not require Mr. Smith to show constant remorse or completely endorse the system's treatment of him, and do not prohibit him from expressing any anger or misgivings,  As set forth in Mr. Smith's original position pleading, 8th Circuit cases where courts have taken away acceptance of responsibility have all been based on criminal conduct. The cases cited by the government in its position pleading were also cited by the defense and involve criminal conduct. The government does not allege any conduct by Mr. Smith that is criminal or illegal.

**V.      UNDERSTATEMENT OF CRIMINAL HISTORY**.

The government fails to provide any remote justification for an upward departure based on understatement of criminal history. It provides no precedent supporting a defendant with one prior criminal history point based on exactly one prior offense receiving an upward departure. A case cited by the government, United States v. Herr, 202 F.3d 1014, 1017 (8th Cir. 2000), involved a defendant with at least fourteen prior convictions that were not counted towards criminal history, and who had prior convictions for failure to appear and resisting arrest, showing that leniency had not been effective. In the other case cited, United States v. Goings, 200 F.3d 539, 542 (8th Cir.

2000), the defendant had seven prior convictions which only resulted in a total of four criminal history points, but showed longstanding substance abuse problems the defendant failed to address. There no circumstances in the instant case that are remotely comparable to factors which have justified an upward departure. Mr. Smith has no extensive criminal record of any sort that could show incorrigibility or any pattern of disrespecting the law. His one prior offense has been sufficiently taken into account. There is no overstatement.

The government cites language in U.S.S.G. § 4A1.3(a)(4)(A) that "the court shall determine the extent of a departure under this subsection by using, as a reference, the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most closely resembles that of the defendant's." This provision states that the **extent** of the departure includes a consideration of likelihood of recidivism. However, the types of information that can serve as a **basis** for an upward departure all involve prior criminal convictions or at least criminal conduct. U.S.S.G. § 4A1.3(a)(2). As stated, Mr. Smith has only one prior juvenile adjudication, and there is no evidence of any other criminal conduct. He therefore clearly does not meet the requisites for a departure under this provision.

## VI.    § 5K2.0 UPWARD DEPARTURE.

The government provides no meaningful explanation as to how this is an extraordinary case that would justify a departure based on reasons not specified in the Guidelines. It suggests the departure could be applicable if the Court does not apply an

enhancement for inert grenades, but fails to explain how the inapplicability of an enhancement would justify invention of a basis to apply that enhancement.

## VII.   18 U.S.C. § 3553(a) FACTORS.

The government again focuses on Mr. Smith's social and political beliefs, his interest in weapons, and his legal internet activity, and his dislike of law enforcement. The government fails to mention that fact that Mr. Smith has clearly renounced his prior racist and bigoted beliefs, and this is due to post-arrest rehabilitation where he has learned from his experience and friendships with inmates from diverse backgrounds. In any event, as previously stated, it is not appropriate and indeed is contrary to our constitutional values to punish Mr. Smith for his beliefs. It is fundamentally abusive for the government to call for harsher punishment because it disapproves of Mr. Smith's social or political views, or his personal likes or dislikes. It is particularly indicative of totalitarianism to punish Mr. Smith because he dislikes the government. The suggestion that Mr. Smith's beliefs make him dangerous and compel that he be imprisoned for 10 years or five times more than the applicable sentencing guidelines is not only offensive to the value of basic freedom and liberty, but is also substantively baseless. What is relevant to the Court's determination is that Mr. Smith has never acted out any expressed beliefs that the government regards as dangerous, and indeed has never harmed or threatened to harm anyone.

11

**CONCLUSION**

For the foregoing reasons and the reasons provided in the original position pleading, Mr. Smith respectfully requests the Court recognize the applicable sentencing guidelines to be 18-24 months, and to sentence him to no more than 18 months.

Dated:  January 18, 2024                    LAW OFFICE OF JORDAN S. KUSHNER

By  s/Jordan S. Kushner
Jordan S. Kushner, ID 219307
Attorney for Defendant
431 South 7th Street, Suite 2446
Minneapolis, Minnesota  55415
(612) 288-0545
jskushner@gmail.com