# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-1196
_____

United States of America

*Plaintiff - Appellee*

v.

River William Smith

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: October 25, 2024
Filed: July 25, 2025
_____

Before LOKEN, SMITH, and GRASZ, Circuit Judges.
_____

GRASZ, Circuit Judge.

    River Smith pled guilty to unlawful possession of a machine gun, in violation of 18 U.S.C. §§ 922(o) and 924(a)(2), and was sentenced to 80 months of imprisonment. Smith appeals his sentence, arguing the district court erred by denying a reduction for his acceptance of responsibility under the United States Sentencing Guidelines Manual (Guidelines or U.S.S.G.); by applying offense level enhancements for the number of firearms and destructive devices involved in the

offense; by imposing a substantively unreasonable sentence; and by imposing certain special conditions of supervised release. We affirm in part, vacate three special conditions, and remand for resentencing.

## I. Background

In September 2022, the Federal Bureau of Investigation (FBI) received a tip from a retired police officer that Smith had been observed at a shooting range engaging in tactical shooting drills while wearing body armor. The FBI established surveillance of Smith and observed him engage in behavior similar to the behavior reported by the tipster, expelling over 200 rounds in one hour. On November 15, 2022, the FBI utilized a confidential human source (CHS1) to contact Smith through social media. CHS1 posed as a former female classmate of Smith. In conversations with CHS1, Smith expressed prejudicial views about various ethnic, racial, and religious groups, as well as his interest in firearms and his hatred of law enforcement. Smith told CHS1 that he used body armor at the shooting range because he wanted to practice what he would "intend to use in a life or death situation." He further explained that he carried two guns and wore body armor "every single day" so he "can defeat cops if [he was] pestered." Smith told CHS1: "[I]f [officers] try to search or arrest me I'm killing them."

The following day, the FBI placed a second confidential human source (CHS2) next to Smith at the shooting range. CHS2 had a firearm equipped with a binary trigger — a device that allows a round to be expelled both on trigger pull and release — which drew Smith's interest. After a brief conversation regarding CHS2's binary trigger, the two met again the following day and Smith inquired about purchasing an auto sear so he could convert his semi-automatic firearms to be fully automatic. Smith provided CHS2 with a downpayment for one auto sear, and later that day followed up with CHS2 about obtaining an additional auto sear for his other firearm. Smith also informed CHS2 of his interest in joining a neo-Nazi paramilitary group, which Smith described as "legit terrorists" who "actually do[] s*** like bombs . . . [p]ipe bombs and car bombs and s*** like that."

CHS1 and CHS2 continued to communicate with Smith. When discussing a mass shooting that had occurred two days prior, Smith referred to the shooter as "a hero" and explained he was "pro mass shooting in general." Smith stated he would not commit a mass shooting himself except if he "was compromised by the police" explaining "if they ever attempted to get [his] guns, [he] would open fire." Smith told CHS1 he feared CHS2 was an informant, but if CHS2 was, Smith would "waste him" and "as many cops as [he] could." Two days later, Smith told CHS1 he made money selling firearms to his friends who were felons and could not buy such weapons themselves. He further stated that "everyday when [he] leave[s] the house," he "mentally prepare[s himself] to die or take out cops." When CHS2 and Smith met up again at the shooting range, Smith asked CHS2 if he could obtain fragmentary grenades for him and explained his interest in obtaining pipe bombs if law enforcement came to his home. Smith assured CHS2 that he would not tell anyone how he obtained the auto sears and grenades because "they won't have anyone to question, bro, cause I'll be f***ing dead, but so will hopefully a bunch of them."

Ultimately, Smith and CHS2 arranged a sale where Smith would obtain three auto sears and three grenades from CHS2. Smith provided CHS2 with the remaining money owed and received the items, though the grenades he actually received were inert. When Smith walked away from CHS2 with these items, law enforcement arrested Smith. At this time, Smith was wearing soft armor and possessed a loaded handgun and three loaded magazines. A search of his residence revealed an estimated $20,000 worth of firearms, magazines, ammunition, and other accessories.

During a prior juvenile adjudication for a weapons-related offense, law enforcement learned Smith had obtained information online about firearms and explosives, including materials with titles like "Al Qaeda Terrorism Manual," "Kitchen Improvised Fertilizer Explosives," and "Explosives and Propellants from Commonly Available Materials." A search of his devices following his arrest for the current offense showed he provided an internet user a file titled "The Poor Man's RPG Shoulder Fired Anti-Tank Grenade" and had searched for how to modify an

AR-15 to be fully automatic. Officers also located a video of Smith watching a promotional video about the Mall of America in Bloomington, Minnesota. As Smith narrates the video, he describes the mall as "a shooting range" and states multiple times that he is going to "shoot up" the mall. Smith's searches included terms like "mall of America metal detectors," which Smith admitted to looking up so he would know what parts of the mall to avoid when carrying a gun. Smith also looked up various mass shootings at schools and nightclubs. In addition, Smith's devices showed other threatening remarks he had made, such as a photograph of various firearms captioned "This isn't even half; half of my Muslim killing arsenal" followed by "Christchurch mosque moment," a reference to a mass shooting in Christchurch, New Zealand. Smith had also made more than twenty searches for police body camera footage as part of an effort to "learn[] about [his] enemy [by] watching police body cam shootings on YouTube."

After his arrest, Smith expressed his lack of remorse for his actions, telling his grandmother on a jail phone call that he "was not in the wrong" and "was obviously correct about a few things [he had] done." Smith asked his mother and grandmother to help him escape from jail, asking his grandmother, "What do you have to lose by shooting some guards?" He further explained his belief that he should have resisted arrest and stated he was "gonna lie and plead guilty, even though [he] know[s] [he is] not guilty."

Smith did indeed plead guilty to unlawful possession of a machine gun, but that did not stop him from continuing to express in recorded jail calls his intent to commit further firearms crimes. Smith told his grandmother he expected her to purchase firearms for him after his release from imprisonment, which he then planned to take to Russia to "kill[] Americans in Ukraine." After Smith's mother reminded him that he could not lawfully obtain a firearm, Smith responded, "It's my decision . . . if you guys catch me with a gun, it's crazy, you can charge me with Felon in Possession of a Firearm." Smith further discussed his interest in a "ghost gunner thing" and how he would "be going up against the U.S. government and its entirety" after his release. Smith remarked that he "hope[d] they're listening" and

"hope[d] it scares them." When discussing a potential sentence, Smith stated his belief that he would "be getting out at 26 years old, [and] have a bunch of money cause [his] grandparents are gone" so he would "have nothing to lose" and "a vendetta against the U.S. government." In another call, Smith discussed a mass shooting at a mall and said: "We got to start a movement to try to get these guys to go to like police stations or something and shooting those places up."

In his interview with a probation officer as part of preparing the presentence investigation report (PSR), Smith claimed his threatening remarks made prior to his arrest, including the Mall of America video, were "shock humor" or for "shock value." He justified the post-plea comments as venting and the result of anxiety while inadequately medicated and that he had no intention of doing the actions he discussed. But based on the remarks, the probation officer did not recommend a reduction for acceptance of responsibility. The PSR also recommended two two-level enhancements related to the grenades: (1) the offense involved three firearms because Smith sought to obtain the three grenades, which are destructive devices that fall under the "firearms" definition; and (2) the offense involved a destructive device — the grenades.

At sentencing, Smith argued he was entitled to a reduction for acceptance of responsibility and that the two enhancements related to the grenades should not apply because the grenades he obtained were inert. The district court overruled these objections to the enhancements because the evidence showed Smith intended to purchase live grenades and only received inert ones because of the nature of the controlled buy. As to acceptance of responsibility, the district court concluded Smith's statements before and after the plea demonstrated a lack of remorse. The district court then calculated Smith's Guidelines range as 41 to 51 months of imprisonment. While the district court rejected the government's various requests for an upward departure, it concluded an upward variance was warranted given the number of firearms and amount of ammunition Smith had and his repeated statements about his "reverence for firearms, violence, and mass shootings" alongside his expressed hatred for various groups. The district court believed

Smith's actions and statements "strongly suggested [he] is inclined to re-offend and poses a threat to society." It sentenced Smith to 80 months of imprisonment to be followed by three years of supervised release.

The district court also imposed special conditions of supervised release. Three of those conditions were aimed at limiting Smith's ability to access certain "extremist" or "inappropriate" materials, the internet, and social media. Special Condition 5 prohibits Smith from "possess[ing] or us[ing] a computer or hav[ing] access to any on-line service without the prior approval" of the Probation Office, as well as allowing probation to install a monitoring program and permitting random searches of any such devices. Special Condition 8 prohibits Smith from "possess[ing], view[ing], access[ing] or otherwise us[ing] material that reflects extremist or terroristic views or as deemed to be inappropriate by the U.S. Probation Office." Special Condition 9 limits Smith's ability to use internet chats, online social networks, or texting applications without approval from his probation officer and the district court. Smith challenged these special conditions as violations of his First Amendment rights. The district court overruled these objections based on Smith's "violent ideation against certain groups of people, including law enforcement," as detailed in the PSR and at an evidentiary hearing prior to sentencing.

## II. Analysis

On appeal, Smith contends (1) the district court erred by denying a reduction for acceptance of responsibility; (2) the district court improperly applied the two two-level enhancements related to the grenades; (3) the sentence was substantively unreasonable; and (4) Special Conditions 5, 8, and 9 violate his First Amendment rights. We address each argument in turn.

### A. Acceptance of Responsibility

We first consider Smith's argument that the district court should have credited him for acceptance of responsibility under U.S.S.G. § 3E1.1 when calculating his

-6-

Guidelines range. "We review the district court's denial of the acceptance of responsibility reduction for clear error." *United States v. Seys*, 27 F.4th 606, 611 (8th Cir. 2022). "The defendant has the burden to establish that he has 'clearly demonstrated' entitlement to the reduction." *United States v. Wineman*, 625 F.3d 536, 538 (8th Cir. 2010) (quoting *United States v. Herron*, 539 F.3d 881, 887 (8th Cir. 2008)). "We afford 'great deference' to the sentencing judge's determination of whether to grant the reduction because of the judge's 'unique position to evaluate a defendant's acceptance of responsibility.'" *Seys*, 27 F.4th at 611 (quoting *United States v. Cooper*, 998 F.3d 806, 810 (8th Cir. 2021)).

Here, Smith argues that his guilty plea, expression of remorse during his presentence investigation interview, and handwritten letter to the district court should have warranted a reduction. While a guilty plea is "significant evidence in favor of an award of the acceptance-of-responsibility reduction," such evidence "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." *Cooper*, 998 F.3d at 810 (quoting *United States v. William*, 681 F.3d 936, 939 (8th Cir. 2012)). Indeed, a defendant who pleads guilty "is not entitled to an adjustment under [U.S.S.G. § 3E1.1] as a matter of right." *Id.* (quoting *William*, 681 F.3d at 939). Instead, a defendant must show "a recognition and affirmative responsibility for the offense and sincere remorse." *Id.* (quoting *United States v. Nguyen*, 52 F.3d 192, 194 (8th Cir. 1995)). A district court may consider both pre- and post-plea conduct when deciding whether a defendant has accepted responsibility. *Id.* at 811.

Smith fails to demonstrate the district court clearly erred by denying a reduction for acceptance of responsibility. The district court considered Smith's pre- and post-plea telephonic statements and concluded "these statements reflect defendant's utter lack of remorse and refusal to take responsibility for his actions." These statements included Smith's remarks that he would not accept he did anything wrong and that he would lie and plead guilty, along with his repeated requests to his family to help him violate federal firearms laws once his sentence is complete. The district court did not clearly err by concluding Smith's statements failed to show

-7-

sincere remorse and outweighed his guilty plea. *See Wineman*, 625 F.3d at 537–39 (denying acceptance of responsibility where the defendant made online statements blaming others for his conviction after his guilty plea).

### B. Grenade Enhancements

Smith next challenges the two enhancements that were applied based on the grenades, arguing the grenades were inert and the government dismissed a separate charge related to them so the grenades could not be used to enhance his sentence. We "review[] factual findings supporting an enhancement for clear error, and legal conclusions about the guidelines de novo." *United States v. Nilsen*, 18 F.4th 587, 589 (8th Cir. 2021). We conclude the district court did not commit a reversible error in applying these enhancements.

The fact that the charge related to Smith's purchase of the grenades was dismissed did not prevent the district court from considering such conduct at sentencing. The Guidelines in effect at Smith's sentencing permitted the district court to consider all relevant conduct proven by a preponderance of the evidence in determining the appropriate advisory Guidelines range, including uncharged or even acquitted conduct. *See United States v. Ruelas-Carbajal*, 933 F.3d 928, 930 (8th Cir. 2019); *United States v. Smith*, 681 F.3d 932, 935–36 (8th Cir. 2012); U.S.S.G. §§ 1B1.3(a), 6A1.3(a) (2023). Thus, the district court was not precluded from considering Smith's purchase and possession of the grenades.

Moreover, the district court did not err in concluding that it was irrelevant for purposes of the number-of-firearms enhancement that the grenades Smith obtained were inert because he intended to obtain live grenades. The Guidelines application notes for the U.S.S.G. § 2K2.1(b)(1) enhancement direct a court to count any firearm that was "unlawfully sought to be obtained" in addition to ones actually possessed. *See* U.S.S.G. § 2K2.1(b)(1) cmt. n.5. The relevant definition of "firearm" includes "any destructive device," which includes a grenade. *See* U.S.S.G. § 2K2.1 cmt. n.1; 18 U.S.C. § 921(a)(3), (4)(A)(ii). Smith did not argue to the district court that he

-8-

intended to purchase inert grenades, and the district court concluded "the record amply supports a finding that the defendant purchased the grenades wanting and believing them to be operable as destructive devices." We find no clear error with this finding given the unobjected-to facts outlined in the PSR, which established Smith's intent to obtain fragmentary grenades. Because Smith sought to possess and agreed to purchase three live grenades, the district court could properly count those grenades even though the ones ultimately obtained were inert. *See* U.S.S.G. § 2K2.1(b)(1) cmt. n.5; *United States v. Maturino*, 887 F.3d 716, 720, 723–24 (5th Cir. 2018) (holding inert grenades counted when calculating the number of firearms possessed under § 2K2.1(b)(1) when a defendant sought to obtain live grenades); *United States v. Birk*, 453 F.3d 893, 900 (7th Cir. 2006) (including firearms a defendant sought to obtain but did not yet possess when applying U.S.S.G. § 2K2.1(b)(1)).

As for the destructive devices enhancement, U.S.S.G. § 2K2.1(b)(3)(B) directs that the offense level should increase by two levels if the offense involved a destructive device as defined in 26 U.S.C. § 5845(f), which includes explosive grenades. *See* U.S.S.G. § 2K2.1(b)(3)(B) & cmt. n.1; 26 U.S.C. § 5845(f). We need not resolve Smith's claim that inert grenades are not destructive devices under this provision because, even if the application of the enhancement was an error, it was harmless. "[A]ny error resulting from an incorrect calculation of the Guidelines is harmless 'when the district court indicates it would have alternatively imposed the same sentence even if a lower guideline range applied.'" *United States v. Holmes*, 87 F.4th 910, 914 (8th Cir. 2023) (quoting *United States v. Hamilton*, 929 F.3d 943, 948 (8th Cir. 2019)). The district court explained that "the sentence imposed would have been the same, even if it had determined that the guidelines enhancements relating to the grenades did not apply" based on its consideration of the circumstances of the offense and the other sentencing factors. "We have previously found that similar explanations rendered a purported error harmless," so we do not need to resolve Smith's challenge to the destructive devices enhancement. *See id.* at 914–15.

## C. Substantively Unreasonable Sentence

We now address Smith's argument that his upward-variance sentence of 80 months of imprisonment is substantively unreasonable. We review the substantive reasonableness of a sentence for abuse of discretion. *Id.* at 916. "A district court abuses its discretion when it 'fails to consider a relevant and significant factor, gives significant weight to an irrelevant or improper factor, or considers the appropriate factors but commits a clear error of judgment in weighing those factors.'" *Id.* (quoting *United States v. Doerr*, 42 F.4th 914, 918 (8th Cir. 2022)). Only in an "unusual case" will "we reverse a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable." *Id.* (quoting *United States v. Feemster*, 572 F.3d 455, 464 (8th Cir. 2009) (en banc)).

Smith claims the district court (1) failed to consider mitigating factors such as his psychological condition and social adversity; (2) punished him for his political beliefs; and (3) committed a clear error of judgment by upwardly varying. We disagree as to each assertion. The district court recognized Smith's mental health condition and heard extensive argument about his social adversity. But it explained that the circumstances of the offense were severe: Smith sought to obtain three auto sears and three grenades after already gathering an extensive stockpile of weapons and ammunition and made repeated statements about his interest in and support for mass shootings and violence against law enforcement and other groups. To the extent the district court did not explicitly reference some of Smith's mitigation arguments, it was not required to do so. *See United States v. Dace*, 660 F.3d 1011, 1014 (8th Cir. 2011). Nor was it obligated to weigh these factors as Smith wanted. *Id.*

Smith argues that a district court cannot impose a sentence based on its approval or disapproval of any defendant's personal beliefs or free speech. But that did not happen here. Rather, Smith's statements reflected that he was taking steps towards being able to carry out potential harm, as shown by evidence like: Smith's messages of a photo of various firearms followed by the words "Muslim killing

-10-

arsenal" and "Christchurch mosque moment"; his video where he claimed he was "gonna go shoot up the Mall [of America]"; and his explanation to CHS1 that he bought auto sears "so [he] can be better a[t] killing people in general." In other words, the district court did not base its sentence on views or beliefs it disliked. Instead, the district court linked Smith's statements to his illegal acquisition of auto sears, his reverence for violence, his expression of an interest in carrying out such violence, and various steps he was taking that could lead to him actually committing an attack against the groups he disliked. Smith's statements also revealed his intentions. Prior to obtaining the auto sears and grenades, Smith assured CHS2 that he would not identify who provided him with the weapons: "[T]hey won't have anyone to question, bro, cause I'll be f***ing dead, but so will hopefully a bunch of them." Moreover, Smith continued to plan how to obtain firearms upon his release from imprisonment while awaiting sentencing.

It is therefore unsurprising that the district court referenced Smith's views when explaining why Smith's conduct and characteristics indicated a longer term of imprisonment was warranted — it was identifying the basis for its reasonable concern that Smith's purchase of auto sears and grenades was part of a plan to inflict violence against those groups, law enforcement, or the public at large as well as Smith's likelihood of recidivism. While Smith points out that there was no evidence that he had ever harmed someone, the district court was empowered to draw reasonable inferences from the evidence, including that Smith likely would have inflicted violence had he not been arrested. *See United States v. Byas*, 581 F.3d 723, 725–26 (8th Cir. 2009) (rejecting a sentencing challenge to a district court's reasonable inference from the facts). Considering the district court rejected the government's request for a statutory maximum sentence and sentenced Smith to 80 months of imprisonment, it is obvious the district court recognized Smith had not carried out a violent attack but that does not mean it was required to blind itself to warning signs when imposing a sentence.

Ultimately, the district court concluded the conduct here was "egregious" and Smith "is inclined to re-offend and poses a threat to society." The district court's

explanation of the sentence showed it considered Smith's arguments but nevertheless viewed the conduct as concerning and warranting an upward variance. We cannot conclude based on this record that it was a clear error of judgment to impose a substantial sentence. The district court did not abuse its discretion.

### D. Special Conditions of Supervised Release

Finally, we turn to Smith's challenges to Special Conditions 5, 8, and 9, which place restrictions on Smith's ability to access certain "extremist" or "inappropriate" materials, the internet, and virtual means of communications. Smith argues these conditions "will unduly constrain [his] ability to lead a normal life" and "fundamentally interfere with his First Amendment rights." We afford the sentencing judge "wide discretion when imposing terms of supervised release" and review those imposed terms for abuse of discretion. *United States v. Crume*, 422 F.3d 728, 732 (8th Cir. 2005). A district court abuses its discretion if it imposes special terms of supervised release that fail to comply with three statutory requirements set forth in 18 U.S.C. § 3583(d). *Id.* at 732–33. "First, the special conditions must be 'reasonably related' to five matters: the nature and circumstances of the offense, the defendant's history and characteristics, the deterrence of criminal conduct, the protection of the public from further crimes of the defendant, and the defendant's educational, vocational, medical or other correctional needs." *Id.* at 733 (quoting 18 U.S.C. § 3583(d)(1)). Next, "the conditions must 'involve[] no greater deprivation of liberty than is reasonably necessary' to advance deterrence, the protection of the public from future crimes of the defendant, and the defendant's correctional needs." *Id.* (quoting 18 U.S.C. § 3583(d)(2)). Finally, "the conditions must be consistent with any pertinent policy statements issued by the sentencing commission." *Id.* We encourage district courts "to provide an explanation of how the conditions satisfy the requirements of [18 U.S.C.] § 3583(d), but where the basis for the special conditions can be discerned from the record, reversal is not required." *United States v. Sanchez*, 44 F.4th 1100, 1103 (8th Cir. 2022) (alteration in original) (quoting *United States v. Simpson*, 932 F.3d 1154, 1156 (8th Cir. 2019)).

We begin with Special Conditions 5 and 9. Special Condition 5 directs that Smith "shall not possess or use a computer or have access to any on-line service without the prior approval of the U.S. Probation and Pretrial Services Office," must "allow[] installation of a computer and Internet monitoring program" on internet-capable devices that he accesses, and must permit probation to conduct "random examinations of computer systems along with Internet, electronic, and media storage devices under [his] control." Similarly, Special Condition 9 states Smith "shall not access Internet Relay Chats or newsgroups or participate in any online social environment (i.e., Facebook, Twitter, . . . etc.) or texting applications, which allow the user interaction unless pre-approved and authorized by the probation officer and court."

These conditions undoubtedly implicate First Amendment rights, and "we are particularly reluctant to uphold sweeping restrictions on important constitutional rights." *See Crume*, 422 F.3d at 733. The internet and social media have become "the most important places (in a spatial sense) for the exchange of views" so "to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735, 1737 (2017). "Even convicted criminals . . . might receive legitimate benefits from these means for access to the world of ideas, in particular if they seek to reform and to pursue lawful and rewarding lives." *Id.* at 1737.

Given these important interests, almost all our cases authorizing such special conditions are cases where a defendant was convicted of crimes involving child pornography or other sex crimes involving a minor and "there was evidence that the defendant used his computer and the Internet to do more than merely possess child pornography." *Crume*, 422 F.3d at 733. *See, e.g., United States v. Demers*, 634 F.3d 982, 983–85 (8th Cir. 2011) (affirming a special condition prohibiting unauthorized internet access when the defendant had used a computer to print out images of child pornography); *United States v. Mayo*, 642 F.3d 628, 630, 632–33 (8th Cir. 2011) (similar). *But see United States v. Osman*, 929 F.3d 962, 964, 966–67 (8th Cir. 2019) (finding no plain error with a special condition restricting computer use by a

defendant who "operated a scheme to prepare false tax returns" using the internet). When upholding such conditions for these offenses, we have looked to the connection of the defendant's illegal conduct, his history and characteristics, and the internet, as well as considering whether the conditions are an outright bar on usage. *See Demers*, 634 F.3d at 984–85; *United States v. Trimble*, 969 F.3d 853, 857 (8th Cir. 2020). Under our precedent, Special Conditions 5 and 9 do not impose "an absolute prohibition" on Smith's ability to use computers, internet-connected devices, or social media. *See Trimble*, 969 F.3d at 857; *United States v. Notman*, 831 F.3d 1084, 1089 (8th Cir. 2016).

Applying the same test used in child pornography offenses cases, we would next consider the extent of the nexus between the internet and Smith's offense conduct and his history and characteristics and affirm the restriction if the connection is substantial enough. *See Demers*, 634 F.3d at 984–85. But this test risks insufficiently protecting a defendant's rights where, as here, the nexus between the conduct and the internet consists of lawful activity. In the typical child pornography case where these conditions are imposed, a defendant's usage of computers and the internet in his crime involves unlawful conduct — obtaining and distributing child pornography. *See id.* Likewise, in the sole case we have found where we affirmed these types of special conditions outside of the child pornography or sex crimes context, the online conduct motivating the restriction was also illegal — running a scheme for filing false tax returns. *See Osman*, 929 F.3d at 964, 966–67. Such cases recognize that once a defendant demonstrates a history of using the internet or social media to commit serious crimes — such as distributing child pornography, recruiting others to join designated terrorist groups, or operating a criminal scheme online — a district court can conclude that a condition requiring pre-approval and monitoring of internet usage while on supervised release is reasonably related to the sentencing factors and no greater deprivation than necessary to achieve sentencing aims. *See id.* at 966–67; *Demers*, 634 F.3d at 984–85; *United States v. Amin*, 85 F.4th 727, 731–32, 735, 738 (4th Cir. 2023) (involving a defendant who provided material support to ISIS). In contrast, here, the conduct cited by the government to justify these special conditions — Smith's expression of his interest in violence and hatred

of various groups — is offensive but does not violate the law. The same is true of him researching and viewing mass shootings or searches related to white supremacist or terrorist groups. While this conduct is troubling paired with Smith's acquisition of auto sears, this online activity does not justify depriving a defendant's future ability to access the internet or social media without prior approval of probation or a court. Otherwise, a defendant's exercise of his First Amendment rights could be used to justify depriving him of those rights while on supervised release.

Based on our review of the record, the district court did not find that Smith had violated any laws based on his online activity. Similarly, the government did not argue or present evidence that Smith's online and social media conduct was criminal. Rather, it asserted Smith could be subject to a pre-approval restriction because he "deeply held several extreme views" and "used electronic devices to connect with like-minded others and disseminate extremism." No matter how abhorrent Smith's views may be, having such positions and discussing them with others is not a proper justification for substantially burdening his ability to exercise constitutional rights by requiring pre-approval from the government before he can access a computer, the internet, or social media. We therefore conclude that the requirement in Special Conditions 5 and 9 to seek approval from probation and the district court before using a computer, the internet, or social networking constitute a greater deprivation than is reasonably necessary to advance sentencing aims. *See United States v. West*, 829 F.3d 1013, 1021–22 (8th Cir. 2016).

Nevertheless, given the concerning and unusual facts here, including Smith's offense conduct, his online activities, and the threat Smith poses to the public, we conclude Special Conditions 5 and 9 can be modified to comply with 18 U.S.C. § 3583(d). In addition to requiring pre-approval, Special Condition 5 required the use of monitoring programs and authorized random searches of Smith's computer devices. Based on the district court's findings, the aspect of the condition related to monitoring and searches is not unduly burdensome on Smith. Smith extensively used the internet and social media applications to discuss his violent ideation and to

view and share content related to mass shootings, violence against individuals, homemade explosives, and how to convert a semiautomatic rifle into a fully automatic one. Using a computer, Smith made his screen capture video in which he stated he was "going to shoot up" the Mall of America and searched "mall of America metal detectors." He also used the internet to research law enforcement shootings, which he explained he did to "learn[] about [his] enemy," as well as mass shootings. The district court concluded this showed the role the internet and social media played in driving Smith's "violent ideation against certain groups of people, including law enforcement," which it believed was likely leading towards violent actions if not for his arrest. In other words, the district court viewed the internet and social media as playing a key role in why Smith was interested in obtaining auto sears and grenades and in helping him plan how to use them to cause violence. Thus, access to the internet and social media amplified the district court's concerns about recidivism and harm to the general public, which are appropriate sentencing considerations. The district court did not clearly err by seeing a significant link between the internet, social media, and Smith's potential to inflict physical violence, despite the lawfulness of his online activities. Combining these facts, Smith's repeated vows to obtain firearms which he needed "for illegal purposes" and to "go[] up against the U.S. government and its entirety," and other indications that he was untrustworthy, the district court did not err by imposing the monitoring and searching portions of Special Condition 5. For related reasons, we believe a modified version of Special Condition 9 may withstand scrutiny, such as requiring Smith to disclose social media accounts that he is able to access to enable his probation officer to monitor his activities on social media. Rather than modifying these conditions ourselves, we vacate Special Conditions 5 and 9 and remand this matter to the district court.

Finally, we consider Special Condition 8, which instructs Smith to "not possess, view, access, or otherwise use material that reflects extremist or terroristic views or as deemed to be inappropriate by the U.S. Probation Office." We conclude the district court abused its discretion by imposing this condition because it is more restrictive than is reasonably necessary to accomplish the sentencing goals. Special

Condition 8 is an absolute ban on certain materials without any mechanism for obtaining prior approval. *See United States v. Simons*, 614 F.3d 475, 483–85 (8th Cir. 2010). Moreover, the terms identifying what material is prohibited are broad and not easily defined. What is "extremist" or "inappropriate" can be intensely debated, making it difficult for Smith to know what he is allowed to possess and view and what he cannot. When such vague and overbroad conditions implicate First Amendment rights, we do not "entrust the task of curing constitutional infirmity for each individual application of the condition to the probation office." *See United States v. Kelly*, 625 F.3d 516, 521 (8th Cir. 2010). Thus, we have rejected special conditions that imposed a broad ban on a defendant convicted of possessing child pornography from possessing any material containing nudity or alluding to sexual activity, as opposed to a narrower restriction on possessing pornography. *See id.* at 519, 522; *Simons*, 614 F.3d at 483–85. Here too, an absolute ban on viewing or possessing materials is not permissible unless the condition is narrowly tailored so as to reasonably relate to an individual defendant, to provide clear parameters for what is prohibited, and to avoid substantially restricting First Amendment rights. A ban on anything probation deems inappropriate is unduly burdensome, vague, and unsupportable based on the facts here. We therefore vacate Special Condition 8.

### III. Conclusion

We affirm Smith's sentence of 80 months of imprisonment, vacate Special Conditions 5, 8, and 9, and remand for resentencing consistent with this opinion.

_____